[Civ. No. 13288. Second Dist., Div. Two. Oct. 24, 1941.]

GEORGE E. DAY, Appellant, v. FIRST TRUST AND SAVINGS BANK OF PASADENA (a Banking Corporation), Respondent.

[Civ. Nos. 13289, 13290. Second Dist., Div. Two. Oct. 24, 1941.]

GEORGE E. DAY et al., Appellants, v. FIRST TRUST AND SAVINGS BANK OF PASADENA (a Banking Corporation) et al., Respondents.

(Two Cases.)

Loeb & Loeb, Milton H. Schwartz and Herman F. Selvin for Appellants.

Newlin & Ashburn, Hudson B. Cox and A. W. Ashburn for Respondent.

SCOTT (R. H.), J. *pro tem.*—Plaintiffs appeal from judgments for defendant First Trust and Savings Bank of Pasadena (hereinafter referred to as defendant) in three suits for damages for alleged breach of trust and for an accounting. Defendant Title Insurance and Trust Company was joined in two of the actions as defendant for the reason that it declined to join therein as a party plaintiff.

On February 4, 1928, plaintiff George E. Day, who is the principal party in interest in all three suits and to whom we shall hereafter refer merely as plaintiff, entered into a trust agreement with defendant pursuant to which he delivered to it sums totaling about a million and a quarter dollars and allowed about $175,000 in income to be added to the trust, all of which the latter undertook to administer as trustee. This relationship and the dealings thereunder furnish the basis for the principal suit we are about to consider. The next year plaintiff set up with defendant for the benefit of certain relatives two additional trusts, each amounting to about $85,000. These two trusts are the basis of the second and third suits, involve the same transactions and require no separate discussion. On December 26, 1933, the first trust was revoked by agreement of the parties and on January 30, 1934, defendant resigned as trustee in the other two trusts. In conformity with the agreement of December 26, 1933, defendant delivered all of the assets of the trusts to the successor trustee designated by plaintiff, except those which because of their nature, as will hereafter appear, it was necessary should remain in defendant's hands for administration. As to such subsequent management there is no complaint. At that time defendant also rendered to plaintiff a full, true and correct general accounting of its administration of the trust estate. Plaintiff reserved only any right he might have to establish liability of defendant for specific losses claimed by him to have been incurred prior to December of 1933 through negligence or other misconduct of defendant, but agreed to wait three years before instituting any suit to recover therefor.

After waiting slightly more than three years plaintiff brought these actions seeking a general accounting and dam-

ages for alleged negligence constituting a breach of trust, claiming as to certain investments which had suffered a reduction in market value during the period in question that defendant should never have made them and that "the beneficiary may reject an improvident investment even though realized loss has not taken place," and claiming further that as to certain bonds defendant should have sold them before their prices went as low as they did. Neither bad faith nor illegality were charged against defendant. The plaintiff was refused an accounting and was denied damages by the trial court.

On appeal plaintiff expresses dissatisfaction with the court's finding that defendant was not negligent in its management of certain trust funds, its finding that plaintiff was guilty of laches and its award to defendant of an amount to compensate it for its attorney's fees and expenses in defending these suits.

It is not our province on appeal to weigh and evaluate the evidence, but merely to determine whether there is material, credible evidence to support the findings of the trial court. (*Albaugh* v. *Mt. Shasta Power Corp.*, 9 Cal. (2d) 751, 773 [73 Pac. (2d) 217]; *Lindemann* v. *San Joaquin Cotton Oil Co.*, 5 Cal. (2d) 480 [55 Pac. (2d) 870].)

The trial court in its findings alluded to the abnormal economic conditions prevailing during the years from 1929 up to the bank holiday in 1933 and thereafter, and noted the fact that the total administration of the trusts had netted plaintiff three and nine-tenths per cent on investments on his behalf over the difficult period in question.

The general nature of the transactions to which plaintiffs take exception, in order of discussion in their briefs, are as follows:

(1) Pasadena Golf Club mortgage. Defendant bank held a $300,000 mortgage on the club property, appraised at $700,-000 and valued even in February of 1933 at $555,000. It sold to the trust participation certificates in the mortgage amounting to $54,400, which totaled about four per cent of the trust, the last one being placed in the trust June 30, 1931. These and other participation certificates were issued and dealt with by the bank as permitted by the provisions of section 104 of the Bank Act (Act 652, Deering's Gen. Laws), under which the bank, as trustee, could buy these

certificates for the trust, buying them from the bank itself as mortgage holder. On October 26, 1932, the bank took a deed to the real property securing the mortgage in lieu of foreclosure. The participation certificates were turned over to the successor trustee. The loan was in good standing at all times when participation certificates were sold to the trust.

(2) Flintridge Golf Club mortgage. A mortgage loan in the sum of $225,000 had been made by the bank on the Flintridge property, appraised as being worth $725,000. Participation certificates were sold to the trust during 1931 and were turned over to the successor trustee.

In the case of both these golf club properties it was within the province of the trial court to consider, as defendant had, not only the appraised value of the real property but also the character, financial standing and past performance of the officers and members of the clubs. No claim is made that golf club mortgages in all cases and under all circumstances were improper investments for trust funds, and it appears that participation in a mortgage on the property of another golf club in the same community had been approved by plaintiff.

(3) H. L. Stowell mortgage. The bank loaned $30,000 to Stowell, secured by a mortgage on a two-story building on the corner of Colorado and Raymond Streets in the city of Pasadena which had been appraised at $112,000. On September 25, 1928, $3400 in trust funds were invested in participation certificates in this mortgage, which were later turned over to the successor trustee.

(4) B. O. Kendall mortgage. A loan of $35,000 secured by a mortgage on a storage warehouse appraised at $83,400 was made to Kendall by the bank in 1925. Participation certificates for $2200 were purchased for the first trust and $800 for one of the other trusts. Interest was paid to April, 1936, but the following year the mortgage was foreclosed, was bought in by the bank and has been managed by it since that date.

(5) John T. Young mortgage. In November, 1928, the bank loaned Young $20,000 to build a motion picture theatre and store building on Eagle Rock Boulevard in Los Angeles, three or four blocks from the Eagle Rock business district. When completed the property was valued at $40,-

000. A participation certificate for $2500 was sold to the trust and is still held by the successor trustee, although by November, 1938, it had been reduced to $1532.22.

(6) Bennett Investment Company mortgage. In September of 1928 the bank loaned $60,000 to the Bennett company, secured by a mortgage on a partly planted citrus ranch in San Diego County appraised at $124,000. Participation certificates were sold to the trust to the extent of $2800 and were delivered to the successor trustee.

(7) Ethel M. Dennis mortgage. In June, 1930, the bank loaned $15,000, secured by a mortgage on a two-story Class C building on West Colorado Street in Pasadena, appraised at $37,000. In March, 1931, a participation certificate for $2500 was sold to the trust and is now held by the successor trustee.

(8) T. S. UpdeGraff mortgage. In June of 1924 the bank loaned $42,500, secured by a mortgage on a four-story and basement building on South Main Street in Los Angeles occupied by the Army and Navy Store and appraised at $119,000. In August, 1928, participation certificates for $3100 were sold to the trust and are now held by the successor trustee.

(9) Wm. H. Bennett mortgage. In March, 1929, the bank loaned $25,000, secured by a mortgage on a two-story Class C building on Santa Monica Boulevard in Los Angeles, appraised at $48,500 and yielding an annual income of $9600. In September of 1931 a participation certificate for $1000 was purchased for the trust and later was delivered to the successor trustee. Plaintiff's assertion that in July, 1938, this loan was finally liquidated with a relatively small loss does not affect the issues now before us.

(10) Charles A. Davey mortgage. In August, 1929, the bank loaned $5000 on a duplex house and garage appraised at $10,150 and later sold the mortgage to the trust. It passed to the successor trustee, who foreclosed the mortgage, bought in the property and took a deficiency judgment which was fully satisfied.

(11) John R. Lee mortgage. In March, 1928, following an introduction by plaintiff, $15,000 was loaned at seven per cent on vacant property in Pasadena appraised at $30,000. Before the termination of the trust, title to the property was

taken in lieu of foreclosure, and this was later transferred to the successor trustee.

(12) Powers and Durston mortgage. In May, 1929, a loan of $3500 was made out of the trust funds upon a double residence appraised at $7125. The mortgage was foreclosed prior to the termination of the trust and title to the property later transferred to the successor trustee.

(13) C. Kern Fiedler mortgage. In June, 1928, the bank loaned $5000, secured by a mortgage on vacant property on south Broadway in Pasadena and located in the "heavy industrial zone," appraised at $9500. A year later the bank sold the mortgage to the trust. It was later reduced to $4000 and was transferred to the successor trustee, who foreclosed it and bid it in for the full amount.

(14) Bastanchury Ranch Company bonds. In February, 1928, the bank bought for the trust $4950 worth of bonds. On appeal the purchase of these bonds is not attacked, but their retention after June, 1930, is declared to have been improper. The total issue of bonds was $1,500,000, supported by property then appraised at $4,235,000. The trust deed was later foreclosed, a new corporation was formed and stock issued to former bondholders. This stock at the time of trial was held by the successor trustee.

(15) Central Oakland Block bonds. From November, 1928, to October, 1929, these bonds of a value of $11,955 were purchased for the trust. There was an issue of $1,500,000 of bonds, supported by an appraisal of $2,577,000 on property securing it. Plaintiff complains of the failure of defendant to sell the bonds until November of 1931, when it disposed of them at a loss.

In connection with the two latter transactions involving bonds, it should be borne in mind that "There is no rule of law which compels the Court to hold that an honest trustee is liable to make good loss sustained by retaining an authorized security in a falling market, if he did so honestly and prudently, in the belief that it was the best course to take in the interest of all parties." (*In re Clark's Will,* 257 N. Y. 132 [177 N. E. 397, 77 A. L. R. 499].)

The trial court found that defendant had furnished plaintiff with frequent statements of receipts and disbursements and statements of investments on hand in said trust, and any and all other information requested by plaintiff pertaining

thereto. The court further found that plaintiff, with full knowledge thereof, acquiesced in the transactions, speculated on the outcome of the depression and then chose to retain the benefits of investments of the same character costing over a million dollars, to attack those here in question and to seek to throw upon defendant all of the burden of his losses; that decrease in value of certain investments "was proximately caused by the then existing economic depression and not by the character of said investments or any negligence of defendant." ██ "Whether the trustee has acted properly in making an investment depends upon the circumstances at the time when the investment is made and not upon subsequent events." (Restatement, Trusts, sec. 227, subd. *m; In re Clark's Will, supra.*) "In making investments not only is the trustee under a duty to use due care and skill, but he must use the caution of a prudent man. In the absence of provisions in the terms of the trust or statutory provisions, the investments which a trustee can properly make are those which a prudent man would make in investing his property outside of ordinary business risks and with a view to the safety of the principal and to the securing of an income reasonable in amount and payable with regularity." (Restatement, Trusts, sec. 227, subd. *e.*) The court found that in its dealings on behalf of the trust defendant "exercised its best judgment, which was a careful judgment, and that it also exercised reasonable care such as an ordinarily prudent person takes with respect to his own affairs and which such an ordinarily prudent person, whether individual or trust company, performing the same trust functions as defendant and under the same conditions, would have exercised with respect to said and each of said matters." These findings are adequately supported by the evidence.

Plaintiff was a sagacious business man, interested in the profitable administration of the trust by defendant. The original trust agreement reserved to him the right to direct it in making investments, and required advance notice of intended sales or reinvestments. This last requirement was not fully observed by the parties, and on August 23, 1930, they amended the trust agreement to read as follows: "The trustor reserves the right to direct the trustee in writing as to the sale, investment and/or reinvestment of all or any part of the *corpus* or principal of the trust estate. The trustee

shall be fully protected in following such directions when received by it, but shall not be required to ask for or demand such directions in any case, which in the judgment of the trustee requires the sale, investment or reinvestment of all or any part of the trust estate. In making investments for the trust estate the trustee shall not be restricted to securities of the character authorized by the laws of the state of California for trust investments.''

■ This is not the case of a beneficiary who is a helpless infant or an incompetent, nor even one unversed in the intricacies of business administration, but is one of an experienced and resourceful man of mature years. It may have been an indication of his emphasis on enhancing the value of the trust rather than on elements of extraordinary security that he voluntarily, after two and a half years' relationship with defendant acting as trustee, undertook to remove any restriction imposed by law as to the character of the investments to be made out of trust funds. But nearly two years thereafter, and from June, 1932, to December, 1933, perhaps due to misgivings of plaintiff as to the outcome of the severe economic readjustment which was taking place, relations between plaintiff and defendant were less amicable, and culminated in the termination of the trust in the latter month. Then by voluntary agreement of the parties in December, 1933, after the passing of this year and a half in which plaintiff knew that a critical analysis of the body of the trust was necessary and proper, an accounting between the parties was had, a reduced fee for services as trustee was accepted by defendant and any action for alleged negligence prior to that time was deferred for a period of three years. All of this shed light on the conduct of defendant and aided the trial court in reaching a conclusion as to the relationship of the parties in the administration of the trust. Defendant of course does not contend that it would have been justified in negligently administering the trust merely because of silent acquiescence of plaintiff in ill-advised investments; but it is obvious that the knowledge and experience of plaintiff made it inevitable that his views as to properties, persons and trends, even when casually imparted, would merit and receive appropriate consideration by defendant together with advice, recommendations, and information from other sources.

In *People's State Bank & Trust Co.* v. *Wade,* 269 Ky. 89

[106 S. W. (2d) 74], it is said: "The two usual purposes for the creation of a trust are (1) to preserve the property intact, and (2) to earn an income for the beneficiary. In either event, the purpose of setting up a trustee to administer a fund or estate is to substitute the supposedly superior judgment of the trustee for that of the beneficiary. It is not expected that the trustee shall 'bury his talents,' nor is the law such a hard master as to require that he exercise an infallible judgment in the investment of funds entrusted to his care. He must exercise the skill and judgment of a reasonably prudent business man in preserving the estate, but at the same time make the estate productive." Among matters which a trustee should consider are the aggregate value of the trust estate, the nature of his other investments on its behalf and the advisability of diversifying his investments in order to insure against adverse conditions in any particular field. (Restatement, Trusts, sec. 227, subd. *m*.)

In the case of *In re Westfield Trust Co.*, (N. J.) 176 Atl. 101, 103, the court said: "The treacherous path that lay before the investor, whether trustee or otherwise, in the spring and summer of 1931 . . . is apparent when, with the advantage of retrospection, we look upon the debacle that ensued. Favored forms of trust investment were sucked into the maelstrom—mortgage investments, corporate bonds, and even cash in bank. Following, came the widespread apprehension of money inflation in company with which was the doctrine, well received even in conservative circles, that participation in ownership equities was extremely desirable because of its proportionate share in the potential inflation of capital and earnings. However loudly it may now be said that people should have foreseen, most men of that degree of prudence and caution that we call ordinary did not foresee." In this case, as in the case of *In re Heyl's Estate,* 331 Pa. 202 [200 Atl. 617, 117 A. L. R. 867], "It is easy now, in view of the happenings to values in the past eight years, to conclude that the appraisements placed upon the properties are too high, measured by today's market price, but no one had the prescience and judgment at the time these loans were made to forecast the conditions which exist today."

 We deem it unnecessary to review the evidence which warrants the conclusion that defendant considered not only the appraised value of the various properties but also the

480

character, business record and financial resources of those with whom it was dealing. A financial institution with broad general knowledge of community needs and trends, of the character and worth of its citizens with whom it has dealt and specific knowledge of property values in that community, may include in its considerations such positive general knowledge, and it is not restricted to letter upon letter and line upon line conformity with a prescribed ritual in estimating the value of a proposed investment in order to avoid a charge of negligently managing funds under its control. It was the province of the trial court to weigh and evaluate the evidence, and it reached a conclusion, on adequate proof, which is adverse to plaintiff's contentions and which is set out in the findings above quoted.

A discussion of the question of laches on the part of plaintiff appears needless in view of our determination that the court's findings that defendant was not negligent are supported by the evidence.

Nor does it appear that plaintiff's resistance to the trial court's award of attorney's fees and court costs to defendant is well founded. The trust agreement provided that the trustee should be indemnified for costs incurred by it in connection with the trust. While it is true that the principal obligations of the trust terminated by agreement of the parties in December, 1933, it was expressly provided that certain aspects of that relationship should survive, and it is in reliance upon that provision that this suit was brought. It was a just and reasonable construction of the agreement by the trial court that defendant should not be made to suffer loss at the hands of any person, least of all the plaintiff, in properly defending acts done for the benefit of plaintiff in the administration of the trust. (See *Ellis* v. *Kelsey*, 241 N. Y. 374 [150 N. E. 148].)

The judgments are affirmed.

Wood, Acting P. J., and McComb, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 22, 1941.