[Civ. No. 50130. Second Dist., Div. Five. July 13, 1977.]

Estate of RALPH W. COLLINS, Deceased.
CHARLES E. MILLIKAN, JR., as Trustee, etc. et al.,
Petitioners and Respondents, v.
MARGARET B. COLLINS HUGHES et al.,
Objectors and Appellants.

## COUNSEL

Stephen J. Kennedy for Objectors and Appellants.

Shield & Smith, J. Lawrence Judy, Jones & Wilson and Robert L. Wilson for Petitioners and Respondents.

## OPINION

**KAUS, P. J.**—Objectors (plaintiffs) are beneficiaries under a testamentary trust established in the will of Ralph Collins, deceased. Carl Lamb and Charles E. Millikan, Jr., (defendants) were, respectively, Collins' business partner and lawyer. They were named in Collins' will as trustees. In 1973 defendants filed a petition for an order approving and settling the first and final account and discharging the trustees. Plaintiffs objected on grounds that defendants had improperly invested $50,000 and requested that defendants be surcharged. After a hearing, the trial court ruled in favor of defendants, and approved the account, terminated the trust, and discharged the trustees. Plaintiff beneficiaries have appealed.

### FACTS

The primary beneficiaries under the testimentary trust were Collins' wife and children; his mother and father were also named as beneficiaries. General support provisions were included; the will also specifically provided that the trustees pay his daughter $4,000 a year for five years for her undergraduate and graduate education.

Paragraph (d) of the declaration of trust recited the powers of the trustees in the usual, inclusive fashion. Subparagraph (3) authorized the trustees to purchase "every kind of property, real, personal or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or

common, irrespective of whether said investments are in accordance with the laws then enforced in the State of California pertaining to the investment of trust funds by corporate trustees."

Subparagraph (3) provided: "Unless specifically limited, all discretions conferred upon the Trustee shall be absolute, and their exercise conclusive on all persons interest[ed] in this trust. The enumeration of certain powers of the Trustee shall not limit its general powers, the Trustee, subject always to the discharge of its fiduciary obligations, being vested with and having all the rights, powers and privileges which an absolute owner of the same property would have."

Collins died in 1963 and his will was admitted to probate. In June 1965, the court ordered the estate to be distributed. After various other payments and distributions, defendant trustees received about $80,000 as the trust principal. After other distributions, such as the annual $4,000 payment for the education of Collins' daughter, the trustees had about $50,000 available for investment.

Defendant Millikan's clients included two real property developers, Downing and Ward. In March 1965, Millikan filed an action on behalf of Downing and Ward against a lender who refused to honor a commitment to carry certain construction loans. In June 1965, defendants learned that Downing and Ward wanted to borrow $50,000. Millikan knew that the builders wanted the loan because of their difficulties with the lender who had withdrawn its loan commitment.

The loan would be secured by a second trust deed to 9.38 acres of unimproved real property in San Bernardino County near Upland. This property was subject to a $90,000 first trust deed; the note which secured the first trust deed was payable in quarterly installments of interest only, and due in full in three years, that is, in July 1968. The $50,000 loan to be made by defendants would be payable in monthly installments of interest only, at 10 percent interest with the full amount due in 30 months, that is, in January 1968.

Defendants knew that the property had been sold two years earlier in 1963 for $107,000. Defendants checked with two real estate brokers in the area, one of whom said that property in that area was selling for $18,000 to $20,000 an acre. They did not have the property appraised, they did not check with the county clerk or recorder in either Los Angeles or San Bernardino County to determine whether there were

foreclosures or lawsuits pending against the construction company. In fact, when defendants made the loan in July 1965, there were six notices of default and three lawsuits pending against Downing and Ward.

Defendants obtained and reviewed an unaudited company financial statement. This statement indicated that the Downing and Ward Company had a net worth in excess of $2 million.

Downing and Ward told defendants that they were not in default on any of their loans, that they were not defendants in any pending litigation, and that there had never been any liens filed on any of their projects. Defendants phoned the bank with whom Downing and Ward had a line of credit and learned that the bank had a satisfactory relationship with the builders.

Based on this information, on July 23, 1965, defendants lent Downing and Ward $50,000 on the terms described above. In addition to the second trust deed, Downing and Ward pledged 20 percent of the stock in their company as security. However, defendants neither obtained possession of the stock, placed it in escrow, nor placed a legend on the stock certificates. Defendants also obtained the personal guarantees of Downing and Ward and their wives. However, defendants did not obtain financial statements from the guarantors.

When the loan was made in July 1965, construction in the Upland area was, as the trial court said, "enjoying boom times, although the bubble was to burst just a few months later." From July 1965 through September 1966, the builders made the monthly interest payments required by the note. In October 1966, Downing & Ward Construction Corporation was placed in involuntary bankruptcy and thereafter Mr. and Mrs. Ward and Mr. and Mrs. Downing declared personal bankruptcies. Defendants foreclosed their second trust deed in June 1967, and became the owners of the unimproved real property. They spent $10,000 in an unsuccessful effort to salvage the investment by forestalling foreclosure by the holder of the first trust deed. In September 1968, the holder of the first trust deed did foreclose. This extinguished the trustees' interest in the property and the entire investment. In short, about $60,000 of the trust fund was lost.[1]

---

[1]The deed foreclosing the trust interest in the property was recorded in September 1968. In February 1969, plaintiffs filed a complaint for an accounting and for damages to surcharge the trustees and to remove the trustees in the Alameda Superior Court. The case was transferred to the Los Angeles Superior Court, but in March 1974, was

The trial court made findings of fact and drew conclusions of law. As relevant, the court found that defendant trustees "exercised the judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercised in the management of their own affairs, not in regard to speculation, but in regard to the disposition of their funds, considering the probable income, as well as the probable safety of their capital." In making the loan, "the cotrustees used reasonable care, diligence and skill. The cotrustees did not act arbitrarily or in bad faith."

## DISCUSSION

The trial court's finding that defendants exercised the judgment and care "which men of prudence, discretion and intelligence exercised in the management of their own affairs," reflects the standard imposed upon trustees by Civil Code section 2261. (See also, Rest.2d Trusts, § 227 [Restatement].)

■ Plaintiffs contend, and we agree, that contrary to the trial court's findings and conclusions, defendants failed to follow the "prudent investor" standard, first, by investing two-thirds of the trust principal in a single investment, second, by investing in real property secured only by a second deed of trust, and third, by making that investment without adequate investigation of either the borrowers or the collateral.

■ Although California does not limit the trustee's authority to a list of authorized investments, relying instead on the prudent investor rule (see 7 Witkin, Summary of Cal. Law (8th ed.) Trusts, § 63, p. 5424), nevertheless, the prudent investor rule encompasses certain guidelines applicable to this case.

First, "the trustee is under a duty to the beneficiary to distribute the risk of loss by a reasonable diversification of investments, unless under the circumstances it is prudent not to do so." (Rest.2d Trusts, § 228; see also, *Estate of Beach* (1975) 15 Cal.3d 623, 634, fn. 9 [125 Cal.Rptr. 570,

---

dismissed under Code of Civil Procedure section 583, subdivision (b) (failure to bring the matter to trial within five years).

This apparently belated action was permitted because the superior court retains jurisdiction when a trust is created by a will (Prob. Code, § 1120), and, until the trustee files an account, which defendant trustees did not do in this case until October 1973, the statute of limitations does not begin to run. (E.g., *Estate of De Laveaga* (1958) 50 Cal.2d 480, 487 [326 P.2d 129].)

542 P.2d 994]; Witkin, *supra,* at p. 5425, see generally, Uniform Management of Institutional Funds Act, Civ. Code, §§ 2290.1-2290.12, 2290.6.)

Second, ordinarily, "second or other junior mortgages are not proper trust investments," unless taking a second mortgage is a reasonable method of settling a claim or making possible the sale of property. (Rest.2d Trusts, § 227, p. 533.) Stated more emphatically: "While loans secured by second mortgages on land are sometimes allowed, they are almost always disapproved by courts of equity. The trustee should not place the trust funds in a position where they may be endangered by the foreclosure of a prior lien . . . . In rare cases equity will sanction an investment secured by a second mortgage, but only when the security is adequate and unusual circumstances justify the trustee in taking this form of investment." (Bogert, Trusts and Trustees (2d ed.) § 675, p. 274.)

Third, in "buying a mortgage for trust investment, the trustee should give careful attention to the valuation of the property, in order to make certain that his margin of security is adequate. He must use every reasonable endeavor to provide protection which will cover the risks of depreciation in the property and changes in price levels. And he must investigate the status of the property and of the mortgage, as well as the financial situation of the mortgagor." (Bogert, *supra,* § 674, at p. 267.)[2] Similarly, the Restatement rule is that "the trustee cannot properly lend on a mortgage upon real property more than a reasonable proportion of the value of the mortgaged property." (§ 229.)

We think it apparent that defendants violated every applicable rule. First, they failed totally to diversify the investments in this relatively small trust fund. Second, defendants invested in a junior mortgage on unimproved real property, and left an inadequate margin of security. As noted, the land had most recently sold for $107,000, and was subject to a first trust deed of $90,000. Thus, unless the land was worth

---

[2]Bogert states that where a statutory list still exists, the margin required is usually either 50 or 40 percent "and it is believed that under the prudent man rule a similar standard will be applied, unless there are special circumstances, as where the mortgage is insured." (Bogert, *supra,* at pp. 268-269.) The Restatement notes that generally a trustee cannot "properly lend on a mortgage upon real property more than from one-half to two-thirds of the value of the mortgaged property." (Rest.2d Trusts, § 229, com. a, p. 544.)

Although we do not intimate that either standard is realistic or definitive in California, we do note that when the property involved was sold two years earlier in 1963 for $107,000, the sales agreement called for the owners to carry a $90,000 mortgage, which would amount to about 15 percent cash investment.

more than $140,000, there was no margin of security at all. Defendants did not have the land appraised; the only information they had was the opinion of a real estate broker that property in the area—not that particular parcel—was going for $18,000 to $20,000 an acre. Thus, any assumption that the property was worth about $185,000—and therefore the $140,000 in loans were well-secured—would have been little more than a guess.

Third, the backup security obtained by defendants was no security at all. The builders pledged 20 percent of their stock, but defendants never obtained possession of the stock, placed it in escrow or even had it legended. They accepted the personal guarantees of the builders and their wives without investigating the financial status of these persons. They accepted at face value the claimed $2 million value of the company shown in an unaudited statement. Defendant Millikan apparently ignored the fact that one lender had, for whatever reasons, reneged on a loan commitment to the builders.

Defendants contend that the evidence sustains the trial court's findings that they exercised the judgment and care under the circumstances then prevailing expected of men of prudence. They rely on the rule that the determination whether an investment was proper must be made in light of the circumstances existing at the time of the investment. (E.g., Witkin, *supra*, § 63, p. 5425.) That rule does not help defendants. Nothing that happened after the loan was made can change the fact that defendants invested two-thirds of the principal of the trust in a single second deed of trust on unappraised property, with no knowledge of the borrowers' true financial status, and without any other security.

We recognize, as did the trial court, that the loan was made in 1965, and defendants, some 10 years later, could not be expected to recall the specifics of their investigation. But that is the point of this case turned inside out: Defendants were required to rely on faded memories because their investigation was limited to casual conversations. No documentation existed, not because it was lost, but because it was never obtained. Further, it is defendants' own fault that they filed their "first and final account" more than eight years after assuming their duties.

Defendants seek to place themselves in the position of the trustee in *Day v. First Trust & Sav. Bank* (1941) 47 Cal.App.2d 470 [118 P.2d 51], who made investments—most of them in the 1920's—and ran into certain difficulties during the years from 1929 until 1933. Leaving aside

the difference between the depression years, covered in *Day,* and the recession in the construction business in the late 1960's, an examination of some of the investments by the trustee in *Day* illustrates the difference between a prudent man and what defendants did here: A $300,000 mortgage on property appraised at $700,000 and valued in February 1933 at $555,000; a $225,000 mortgage on property appraised at $725,000; a $30,000 mortgage on property appraised at $112,000; a $35,000 mortgage on property appraised at $83,000; a $15,000 mortgage on property appraised at $37,000. (*Id.,* at pp. 473-475.) Here defendants must be surcharged, not because they lacked prescience of what would happen, but because they both lacked and ignored information about what was happening at the time.

Plainly, defendants' conduct did not meet the prudent-investor standard. They claim, however, that the trust instrument conferred on them an "absolute discretion." Therefore, they argue, their sole obligation was not to act arbitrarily and to use their best judgment. (*Coberly* v. *Superior Court* (1965) 231 Cal.App.2d 685, 689 [42 Cal.Rptr. 64].)

We leave aside that even a trustee with "absolute discretion" may not "neglect its trust or abdicate its judgment," (*Coberly* v. *Superior Court, supra,* 231 Cal.App.2d at p. 689) or show a "reckless indifference" to the interests of the beneficiary. (Rest.2d Trusts, § 222.) The record before us contains no evidence that defendants satisfied even the lesser standard of care for which they contend.

More fundamentally we do not agree with defendants' premise. While the declaration of trust may possibly enlarge the prudent-investor standard as far as the *type* of investment is concerned, it cannot be construed as permitting deviations from that standard in investigating the soundness of a specific investment. This distinction is well established. Comment v, to section 227 of the Restatement reads, in part, as follows: "v. An authorization by the terms of the trust to invest in a particular *type* of security does not mean that any investment in securities of that type is proper. The trustee must use care and skill and caution in making the selection. Thus, if the trustee is authorized by the terms of the trust to invest in railroad bonds, he is guilty of a breach of trust if he invests in bonds of a railroad company *in which a prudent man would not invest because of the financial condition of the company.*"[3] (Italics added.)

---

[3]See also 3 Scott on Trusts (3d ed. 1967) section 227.12 and cases cited.

The provisions on which defendants rely are subparagraphs (3) and (11) to paragraph (d), quoted earlier. Neither supports their position. Subparagraph (3) merely tracks section 2261 of the Civil Code and adds that the investments listed therein are permissible "irrespective of whether said investments are in accordance with the laws then in force in the State of California pertaining to the investment of trust funds by corporate trustees." This adds nothing. **(5)** Neither Civil Code section 2261 nor any other authority which we can locate authorizes different types of investments for "corporate trustees" as distinguished from amateurs. The difference is, rather, that the corporate trustee is held to a greater standard of care based on its presumed expertise. (*Estate of Beach, supra,* 15 Cal.3d 623, 635; *Coberly* v. *Superior Court, supra,* 231 Cal.App.2d 685, 689; Bogert, *supra,* § 541, p. 453.)

■ In any event, even if the trust instrument permitted a type of investment generally frowned on under the prudent-investor rule, it did not authorize the trustees to make it blindly. Defendants might have a point, had they purchased a well-secured second trust deed after careful investigation. Clearly, however, the nature of their investment is the least of their problems.

Alternatively, defendants rely on the language in subparagraph (11) tha̟ "all discretions conferred upon the Trustee shall be absolute, . . ." This reliance, too, is misplaced.

■ First, viewed as an exculpatory clause, subparagraph (11) is subject to the rule of strict construction. (Rest.2d Trusts, § 222, com. a, p. 517; 3 Scott on Trusts, *supra,* § 222.2 and cases cited.)

■ Second, the "absolute discretion" is "specifically limited" by the requirement that the trustee is "subject always to the discharge of its fiduciary obligations, . . ."

Third, in context subparagraph (11) refers only to "discretions conferred on the Trustee" in paragraph (d) of the trust which, as noted, deals exclusively with powers, as distinguished from the degree of care with which they are to be exercised. Nor does any other part of the declaration of trust mention any relevant discretion which subparagraph (11) would make "absolute." Nowhere did the trustor say anything about a discretion not to diversify, a discretion to invest in a junior encumbrance without ability to protect against the foreclosure of a senior lien, a discretion not to make a businesslike investigation of the credit and net

worth of the borrower, or a discretion not to insist on an appraisal of the security given by the borrower.

The orders are reversed with directions to determine the damages to which plaintiffs are entitled.

Stephens, J., and Ashby, J., concurred.

A petition for a rehearing was denied December 9, 1977, and respondents' petition for a hearing by the Supreme Court was denied October 6, 1977.