[S.F. No. 23224. In Bank. Dec. 1, 1975.]

Estate of SETH G. BEACH, Deceased.
BANK OF CALIFORNIA, as Executor, etc.,
Petitioner and Respondent, v.
JOETTE BEACH CARTER et al., Objectors and Appellants.

624

**COUNSEL**

George M. McClarrinon for Objectors and Appellants.

Cushing, Cullinan, Hancock & Rothert, Vincent Cullinan and Lawrence W. Thorpe for Petitioner and Respondent.

McCutchen, Doyle, Brown & Enersen, Brent M. Abel, Robert A. Mills and James C. Fowler as Amici Curiae on behalf of Petitioner and Respondent.

**OPINION**

**WRIGHT, C. J.**—Seth G. Beach died on August 4, 1968, leaving an estate valued at over $2.4 million. His will, after making a number of smaller dispositions, placed the bulk of his estate in a testamentary trust for the benefit of his four children and named the Bank of California as both executor and trustee. The estate included 27,700 shares of Reserve Oil and Gas Company (Reserve) common stock appraised at $391,262.50, or $14.125 per share. In June 1969 the executor sold 3,000 shares of the stock for approximately $16 per share to raise funds toward the payment of claims, taxes and expenses of administration. By the time the remaining 24,700 shares were distributed to the testamentary trustee in September 1970, their value had declined to little more than $6 per share.

Three of the four residuary trust beneficiaries filed a contest of the executor's first account (Prob. Code, § 927)[1] claiming the estate was entitled to damages from the executor for the latter's alleged negligence in not selling the stock while its market price was above its appraised value at the date of death. After discovery proceedings and a six-day nonjury trial, the trial court found that the executor had exercised due care in retaining the stock and accordingly rendered judgment rejecting

---

[1]All section references hereinafter are to the Probate Code unless otherwise indicated.

the exceptions to the account and declaring the account settled.[2] Appealing from the judgment,[3] objectors (hereafter contestants) assert that the trial court applied an incorrect standard of care in exonerating the executor from negligence and that in any event the finding of no negligence is unsupported by the evidence. We conclude that the executor was not negligent if it exercised ordinary care in applying the skills and knowledge ordinarily possessed by banks engaged in the trust business under similar circumstances to the administration of the present estate, and that the evidence sufficiently shows that the executor met this standard. We reject the contestants' contention that the bank can be called to account for performance of its duties as *trustee* in the present proceeding for settlement of its account as *executor* even though it might have to give due consideration to the existence and terms of the trust and the circumstances of the beneficiaries of the trust in order to properly carry out its duties as executor in the probate administration of the estate.

With regard to other contentions on appeal, we conclude that the trial court committed no error in denying contestants' demand for a jury trial, in allowing the executor extraordinary compensation for defending against the contest, and in making an order subsequent to the judgment (separately appealed from) allowing the executor's attorneys extraordinary fees for such defense. However, such compensation and fees should have been charged against the entire estate instead of against only the contestants' shares, and the executor should not have been allowed interest based on deferral of some of its compensation. With modifications to eliminate these errors, we affirm the judgment and the order.

### *Bank's Alleged Liability as Executor for Retention of Stock in Estate*

■ An executor is not liable for losses suffered by the estate without his fault (§ 920) but may be required to reimburse the estate for losses proximately resulting from his failure to exercise the requisite duty of care in its administration (*Estate of Guiol* (1972) 28 Cal.App.3d 818 [105

---

[2]The probate court properly incorporated the settlement of the account into the judgment resolving the contested issues (§ 1230) rather than making a separate order for settlement. (*Estate of Jamison* (1951) 107 Cal.App.2d 483, 485-486 [237 P.2d 546].)

[3]Section 1240, authorizing appeals from an "order . . . settling an account of an executor," was enacted as a continuation of former Code of Civil Procedure section 963, subdivision 3, which authorized appeals from a "judgment or order" settling an executor's account, and therefore authorized the present appeal from the judgment. (*Estate of Jamison, supra,* 107 Cal.App.2d at pp. 484-485.)

Cal.Rptr. 35]). The standard of care generally applicable to executors is "that degree of prudence and diligence which a man of ordinary judgment would be expected to bestow upon his own affairs of a like nature." (*Estate of Moore* (1892) 96 Cal. 522, 525 [31 P. 584]; *Estate of Barbikas* (1959) 171 Cal.App.2d 452, 457-458 [341 P.2d 32].) However, as a bank engaged in the business of acting as a fiduciary for estates and trusts (see Fin. Code, §§ 106-107, 1502), the executor could be held liable for negligence if it failed to exercise the skill and knowledge ordinarily possessed by such professional fiduciaries. (*Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 489 [275 P.2d 15]; Rest. 2d Torts, § 299A.)

■ Contestants claim that the judgment is not supported by the evidence. To consider this contention, we review the facts, viewing the evidence in the light most favorable to the executor and indulging in all reasonable intendments and inferences that tend to sustain the judgment. (*McCarthy* v. *Tally* (1956) 46 Cal.2d 577, 581 [297 P.2d 981]; *Berniker* v. *Berniker* (1947) 30 Cal.2d 439, 444 [182 P.2d 557]; *Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689].)

Under the decedent's will the residue of the estate left in trust was to be divided into four shares, one for each of the testator's children. One third of each child's share was to be distributed to him or her at age 25, one third at age 30, and the remaining third at age 35, with periodic distributions of income from the part of the share held in trust. The decedent's four children were: Marianne Beach Edwards, born June 1, 1939; Joette Beach Carter, born January 1, 1942, and twins named Scott Gregory Beach and Schuyler Jean Beach, born November 19, 1952. Thus, upon the decedent's death both Mrs. Edwards and Mrs. Carter were eligible to receive one third of their trust shares, and Mrs. Edwards became eligible for an additional third nine months thereafter. Only Mrs. Carter and the twins are contestants in the present proceeding.

The principal assets of the estate and their appraised values as of the date of death were 27,700 shares of Reserve common stock ($391,262.50); Reserve convertible debentures ($117,625); Mother Lode Bank common stock ($300,600); government and public utility bonds ($691,238); real estate ($387,000); a lumber business which was liquidated during administration ($299,389); and cash, notes, insurance and miscellaneous items ($235,680).

The Reserve stock was listed on the American Stock Exchange. The company's main activity was the exploration for and production of oil.

The stock paid no dividend, and the company's earnings were "flat," lacking any significant increase or decrease. The principal attraction of the stock was the prospect of capital growth through oil exploration activities.

Donald T. Dooling, the bank's trust officer immediately in charge of the estate, testified that when administration commenced in August 1968 he was concerned about the size of the Reserve holding and discussed the matter with Roger Newell, head of the bank's portfolio management section, who replied within a week or two that no immediate steps were necessary. Newell testified that on receiving Dooling's inquiry he went to the securities research section to read available information concerning Reserve and discuss the stock with the section's security analysts, whose function was to analyze individual securities and industries as well as general economic conditions. Newell concluded there was no reason to recommend immediate sale of the stock because he found no apparent "deterioration" in the company's balance sheet, management, or other "fundamentals."

The following December, the bank's trust investment committee (T.I.C.), responsible for portfolio management decisions, made an "initial review" of the estate's assets and decided to retain the stock because of the absence of deterioration in the company. In January 1969 the same committee considered what assets should be sold to raise cash needed for administration and decided "to continue with the program to sell the real estate assets and to defer sale of Reserve." The reasons for this decision were (1) that the real estate required current expenditures from the estate and was not as readily marketable as a listed stock, which could be sold later if and as needed, and (2) the absence of any evidence of deterioration in Reserve.[4]

In February 1969, the bank's trust *securities* committee (T.S.C.) recommended that holdings of Reserve stock be sold. However, the T.S.C.'s recommendation was based on information furnished by the securities research section concerning the stock itself, without regard to the nature of the trust or estate in which the stock might be held. Despite the T.S.C.'s recommendation, the T.I.C. decided to retain the Beach estate's holding of the stock because of the continued absence of any sign of deterioration in the company.

---

[4]The estate received $26,000 from the sale of real estate in November 1968, $54,000 from the sale of the decedent's residence in December 1968 and January 1969, and approximately $44,000 from the sale of real estate in July and August of 1969.

In May 1969, Dooling reported to John Pierson of the portfolio management section that the estate required $390,000 of additional cash to conclude administration and suggested consideration of a sale of part of the Reserve holding for this purpose.[5] About this time it was learned that the Reserve convertible debentures held by the estate would be called for redemption on July 16th at a price below the current market price. To avoid a loss through redemption the estate would have either to sell the debentures or to convert them into some 7,600 shares of common stock thereby increasing its stock holding to some 35,300 shares. Under these circumstances the T.I.C., on advice from the portfolio management section, decided to raise the needed cash by selling the debentures, 3,000 shares of the stock, and certain short-term government bonds. Based on court authorization received on June 24, 1969, the executor sold the debentures for $119,500 and the 3,000 shares of stock for $47,607, reducing the estate's holding of the stock to 24,700 shares. Newell testified that in recommending this sale the portfolio management section felt that "some reduction of Reserve was in order," that the "one-third reduction" (35,300 to 24,700 shares) was "appropriate," and that the remaining Reserve stock was acceptable for distribution into the trust because the company remained fundamentally sound and the stock had "some long-term potential for increase in value."

In July and August of 1969 the stock's market price commenced a gradual decline which continued into the following May and was followed by a moderate rise until distribution to the trustee in the fall.[6] The bank's security analysts interpreted this decline as a reflection of a downward trend in stocks generally which was particularly pronounced

---

[5]The estate's cash needs included $200,000 for California inheritance taxes and $611,000 for federal estate taxes. Cash was available to the estate not only from the cash assets but also from the maturing of some of the bonds and the sales described in footnote 4, *ante,* of about one-third of the estate's real property.

[6]An exhibit showing monthly price ranges on the American Stock Exchange indicates that the stock reached its high point for the period of probate administration in June 1969, when the price per share ranged between 14⅜ and 20⅞. There was then a gradual decline to a range of 7¾ to 10¾ in December 1969 and thence to the low point of May 1970, when the price ranged between 4⅝ and 7⅜. Distribution of the stock from the executor to the trustee was ordered on September 28, 1970, and acknowledged by the trustee's receipts dated October 6, 1970. The stock's price range for September was 7¼ to 10 and for October was 8 to 10⅝.

The trial court's findings and memorandum decision state that at the conclusion of probate the stock was worth "approximately $6.00 per share." Contestants' pleadings, filed August 7, 1970, and amended August 26, 1970, claimed damages based on an alleged current value of $6 per share. This allegation was apparently based on the information reflected in the foregoing exhibit, which showed a price range of 5⅜ to 7⅞ for July 1970 and of 6⅛ to 8 for August 1970.

in oil stocks and not as indicating any deterioration in Reserve's operations or prospects.[7]

In determining that the Reserve stock was suitable for inclusion in the trust, the bank's portfolio management section considered the circumstances and resources of the trust beneficiaries and determined that the tentative objectives of the trust should include not only the production of income but also long-term capital growth as a protection against inflation. None of the beneficiaries or their families had any special problems of ill health or disability which would require unusual amounts of income. The twins in addition to having interests under the trust were the beneficiaries of a settlement agreement between their mother and the decedent under which the estate was paying $500 per month for their benefit in child support and was obligated to pay the expenses of their college educations. Assets distributable to the trust other than the Reserve stock were producing substantial amounts of income.[8] Under these circumstances the growth potential of Reserve was deemed to make it a desirable trust asset despite the fact that it paid no dividends.

■ ■■■■ On the other hand, the portfolio management section did not base its decision to retain the 24,700 shares of Reserve stock on any standard of diversification.[9] Its practice was not to attempt to diversify particular investment holdings during probate because of the restrictions on the executor's power to reinvest.[10] Thus the retention of

[7] A security analyst employed in the bank's securities research section testified that between June 1969 and September 1970, while the monthly low price of Reserve stock was dropping by about 45 percent, there were corresponding percentage drops in the prices of the following oil stocks: Atlantic-Richfield, 47 percent; Union, 45 percent; Continental, 35 percent; Standard of California, 33 percent; Marathon, 50 percent.

[8] Approximately $72,000 in accumulated income was distributed from the probate estate to the trust: $20,000 by preliminary distribution in April 1969, $12,000 by preliminary distribution in September 1969, and $40,000 by final distribution in September 1970. Moreover, the preliminary distribution of April 1969 included the 16,700 shares of Mother Lode Bank stock, which yielded annual dividend income of $13,360.

[9] To comply with the standard of the prudent investor laid down by section 2261 of the Civil Code, a trustee is ordinarily required to diversify the trust investments. (*Mandel* v. *Cemetery Board* (1960) 185 Cal.App.2d 583, 587 [8 Cal.Rptr. 342].)

[10] The executor could invest cash of the estate only in savings accounts (§ 585) or certain government securities (§§ 584, 584.1). Contestants suggest that the executor had broader investment powers under section 584.5, which allows the probate court to "authorize a personal representative to invest and reinvest any surplus moneys in his hands in any manner provided by the will." (See also, § 584.6.) However, the section did not take effect until November 13, 1968, over three months after the decedent's death, and in any event there was no provision in the will for any such additional forms of investment. Contrary to contestants' argument, the mere absence from the will of

the stock in the estate was based on the executor's determination that Reserve was not in a deteriorating condition, that no further cash was needed to complete administration of the estate, and that the stock was a suitable asset for inclusion in the trust.

 The bank concedes that as a professional fiduciary its liability must be determined by more stringent standards than would the liability of a lay executor. Those undertaking to render expert services in the practice of a profession or trade are required to have and apply the skill, knowledge and competence ordinarily possessed by their fellow practitioners under similar circumstances, and failure to do so subjects them to liability for negligence. (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685] (attorney); *Gagne* v. *Bertran, supra,* 43 Cal.2d 481, 489 (professional soil tester); *Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 473 [234 P.2d 34, 29 A.L.R.2d 485] (physician); Rest. 2d Torts, § 299A; cf. *Coberly* v. *Superior Court* (1965) 231 Cal.App.2d 685, 689 [42 Cal.Rptr. 64] (bank's liability as trustee despite exculpatory provisions of trust).) Proof of liability for failure to possess or exercise these professional attributes requires the testimony of a qualified expert where the claimed injury and its causes are beyond common knowledge. (*Brown* v. *Colm* (1974) 11 Cal.3d 639, 643 [114 Cal.Rptr. 128, 522 P.2d 688]; *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 236 [104 Cal.Rptr. 505, 502 P.2d 1]; *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 156 [65 Cal.Rptr. 406, 28 A.L.R.3d 368] (liability of attorney).)

 The bank contends we should accept the findings of its freedom from negligence simply for lack of testimony by qualified experts sufficient to prove its noncompliance with the relevant professional standards. Plaintiff called three expert witnesses who gave reasoned opinions that the bank should have sold more or all of the Reserve stock during the administration of the probate estate. One of these witnesses was president of an investment management firm; another had been in charge of the trust department of a title company[11] from 1952 to 1966; and a third was director of research for a stock brokerage firm. It is unnecessary for us to consider the sufficiency of these witnesses' expert qualifications or testimony because the findings are fully supported by the testimony of the *bank's* expert witnesses, who included not only those

---

expressed restrictions on the executor's powers of investment was not a provision permitting additional forms of investment within the meaning of section 584.5.

[11]Title insurance companies have legal authority comparable to that of banks to maintain trust departments for carrying on the business of acting as executor or trustee or in other fiduciary capacities. (Fin. Code, §§ 106, 107, 1501.)

of its employees already mentioned but also an independent securities analyst and a senior trust officer of a competing bank with 38 years of banking experience. The latter witness testified in answer to a hypothetical question that in his opinion and based on his professional experience, the executor's retention of the 24,700 shares of Reserve stock in the estate was prudent and did not deviate from any investment standard in California known to the witness.

It is suggested that the trial court's findings and memorandum decision show that it failed to give proper weight to the requirement that the bank use the skills and knowledge ordinarily possessed by professional fiduciaries in similar circumstances. However, the memorandum decision refers to the last mentioned expert as "[t]he most persuasive witness produced . . . who had excellent qualifications, vast experience, vast knowledge and who impressed the Court as being totally impartial" and further commends the bank's "committee set-up of checks and balances and review within [its] trust department" as "excellent." The findings uphold the bank's exercise of due care "in the manner in which it utilized all of its available relevant internal banking services and procedures" in making the decisions for which contestants seek to impose liability. (See fn. 12, *post.*) Under these circumstances we are satisfied that the trial court properly judged the bank's conduct by professional rather than lay standards.

■ Contestants claim that the trial court erred in determining the bank's liability according to its exercise of care as an executor rather than as a testamentary trustee.[12] They contend that because the bank received title to the trust assets upon the decedent's death by operation of his will, subject only to probate administration (§§ 28, 300; *Estate of Lefranc* (1952) 38 Cal.2d 289, 297 [239 P.2d 617]; *Estate of Muhammad* (1971) 16 Cal.App.3d 726, 733 [94 Cal.Rptr. 856]), the bank acted during probate

---

[12]The trial court found: "[The bank] demonstrated its exercise of care and prudence *according to the standard of care and prudence prevailing in the State of California for executors of probate estates* in the manner in which it utilized all of its available relevant internal banking services and procedures in determining the cash needs of the estate, in determining which assets would be used for payment of administration expenses, and in arriving at and executing its decision to sell 3,000 shares of Reserve Oil & Gas Company common stock during probate and its decision to retain the balance of said share [*sic*] for distribution to the trusts created under decedent's will." (Italics supplied.) In another finding the trial court declared: "At all times referred to in the contests, the [bank] acted in the capacity as an executor of a probate estate, and not as a trustee." Similarly, the trial court's memorandum opinion stated, "An executor is not a trustee; his duty is to conserve, not to invest." It also said, "It must be kept in mind that here we are dealing with a probate estate, not a trust problem."

administration in a dual capacity as executor and trustee, and that its supposed capacity as trustee subjected the bank's decisions concerning the retention or disposition of the Reserve stock in the probate estate to the "prudent investor" rule of Civil Code section 2261.[13] Contestants are particularly concerned with the requirement implicit in the rule that investments be diversified (*Mandel* v. *Cemetery Board, supra,* 185 Cal.App.2d 583, 587) and argue that by judging the bank solely on its performance as executor the trial court erroneously failed to consider whether the retention of the unsold shares of Reserve stock in the estate violated this diversification requirement. Although contestants recognize that apart from sections 584.5-584.6 (see fn. 10, *ante*) the executor could not have invested the proceeds from any sale of Reserve stock in anything but savings accounts or government securities (§§ 584, 584.1, 585), they argue that even those forms of interest-bearing investments would have been preferable to retention in the estate of a disproportionately large holding of a "speculative" stock yielding no dividends.

In making this argument contestants overlook or misconceive basic distinctions between the bank's duties as executor and its duties as trustee. In the first place, the fact that the same bank was named as both executor and trustee in the will is immaterial. Even though the executor in handling estate assets may sometimes be required to take into account the fact that all or part of the net estate will be distributed to a testamentary trust with particular terms and beneficiaries, the executor's duty in this regard does not vary according to whether the executor and trustee are the same or different entities. The present bank's powers and

---

[13]The prudent investor rule is embodied in subdivisions (1) and (2) of section 2261 of the Civil Code, which provide as follows:

"(1) In investing, reinvesting, purchasing, acquiring, exchanging, selling and managing property for the benefit of another, a trustee shall exercise the judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of their capital. Within the limitations of the foregoing standard, and subject to any express provisions or limitations contained in any particular trust instrument, a trustee is authorized to acquire every kind of property, real, personal or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or common, which men of prudence, discretion and intelligence acquire for their own account.

"(2) In the absence of express provisions to the contrary in the trust instrument, a trustee may continue to hold property received into a trust at its inception or subsequently added to it or acquired pursuant to proper authority if and as long as the trustee, in the exercise of good faith and of reasonable prudence, discretion and intelligence, may consider that retention is in the best interests of the trust. Such property may include stock in the trustee, if a corporation, and stock in any corporation controlling, controlled by, or under common control with such trustee."

duties as executor were just as distinct from its powers and duties as trustee as if the will had named another bank as trustee. (*Goad* v. *Montgomery* (1898) 119 Cal. 552, 561 [51 P. 681] (powers of executor and trustee are distinct); *Estate of de Laveaga* (1958) 50 Cal.2d 480, 486 [326 P.2d 129] (beneficiaries' rights in trust not before court on decree of distribution to trustee); *Estate of Freman* (1960) 185 Cal.App.2d 527, 530 [8 Cal.Rptr. 311] (same).)

Moreover, the anticipation that the bulk of the estate would be transferred to a testamentary trustee, which in this case happened to be the same bank, did not require the executor to manage the estate assets as if they were already being held under the terms of the trust. The executor has numerous functions and obligations not normally imposed upon a testamentary trustee, such as presenting the will for probate (§§ 320, 323, 324), locating assets (§§ 571, 581), locating beneficiaries (§ 326, subd. (3)), handling creditors' claims (§§ 700-719, 730-738), providing for any immediate needs of the decedent's family through a family allowance (§ 680), preparing returns for and paying estate and inheritance taxes (Int. Rev. Code, § 2002 (26 U.S.C. § 2002); Rev. & Tax. Code, § 14101) as well as income taxes of the decedent and the estate (Int. Rev. Code, §§ 641(b), 6012(b) (26 U.S.C. §§ 641(b), 6012(b)); Rev. & Tax Code, § 18405) and distributing the remaining assets to the beneficiaries (§§ 1000-1003, 1020-1029). The executor holds and manages the estate assets incidentally to performance of the various duties of administering the estate, in contrast to the testamentary trustee, whose primary mission is to serve the trust beneficiaries under the terms of the trust. Usually, as in the instant case, such management by the executor concerns the interests of the trust beneficiaries only through its effect on the nature and value of the property distributed to the trustee and the timing of such distribution or distributions. (See *Estate of de Laveaga, supra,* 50 Cal.2d 480, 486; *Estate of Marre'* (1941) 18 Cal.2d 184, 190 [114 P.2d 586].)

The present record reveals that in handling the Reserve stock in the probate estate the executor made three kinds of decision affecting the contestants' interests as trust beneficiaries and supports the trial court's conclusion that in all three areas the executor applied the requisite skills and knowledge and exercised the requisite degree of care. These decisions related to (1) preservation of the estate assets, (2) selection of assets to sell for needed cash and (3) timing of distributions to the trust. Each area of decision will be considered in turn.

■ A primary duty of the executor is to take reasonable steps to preserve the assets of the estate. (*Estate of King* (1942) 19 Cal.2d 354, 358 [121 P.2d 716]; *Estate of McSweeney* (1954) 123 Cal.App.2d 787, 793 [268 P.2d 107]; *Estate of Smith* (1931) 112 Cal.App. 680, 685 [297 P. 927].[14]) The duty of preservation may require the executor to take affirmative steps to prevent deterioration in value. (*Estate of Porter* (1900) 129 Cal. 86 [61 P. 659] (sale of vineyard-orchard to avoid maintenance expenses pending escheat proceeding); *Estate of Fernandez* (1898) 119 Cal. 579, 585 [51 P. 851] (care of livestock until sold); *Estate of Smith* (1897) 118 Cal. 462 [50 P. 701] (maintenance of vineyard); cf. § 770, authorizing executor's sale without notice of "[p]erishable property and other personal property which will depreciate in value if not disposed of promptly.") However, an executor or administrator is not liable for any decreases in the value of estate assets on account of his acts or omissions done in good faith and without negligence. (§ 920 ("He shall not . . . suffer loss by the decrease or destruction without his fault, of any part of the estate"); *Estate of Armstrong* (1899) 125 Cal. 603, 604-606 [58 P. 183]; cf. *Estate of Fraysher* (1956) 47 Cal.2d 131, 138-139 [301 P.2d 848].)

■ Contestants argue that the executor's duty of preservation required it in the exercise of due care to sell the Reserve stock before it depreciated in market value, but the authorities upon which they rely indicate that such liability has rarely been imposed.[15] The executor

---

[14]The last two cited cases hold that the executor's primary duty of preservation gives rise to his authority to deposit estate cash in a savings account but that because his duty is to protect rather than invest estate assets, such deposits are not mandatory. The duty to invest became mandatory by the enactment in 1971 of section 920.3, which requires an executor or administrator to show that he has kept cash not required for the estate's orderly administration invested in interest-bearing accounts or other investments authorized by law. The bulk of the present estate, including the Reserve stock, was distributed prior to this enactment. (See fn. 6, *ante*.)

[15]The cases relied upon by contestants are collected in an annotation in 92 A.L.R. 436, Liability of executor or administrator for Loss by Depreciation in Value of Securities, through Retaining or Deferring Sale Thereof. The few cases where liability was imposed are distinguishable. Thus, in *Mathews* v. *Sheehan* (1904) 76 Conn. 654 [57 A. 694], the administrators were held liable for not effecting a reasonably prompt settlement of the decedent's margin accounts with stockbrokers on the ground that maintaining a "speculative account" in stocks and bonds was equivalent to carrying on a trade or business, which an executor may not do without special authorization except at his own risk. Although the same consequences attach to a personal representative's operation of a business in a California decedent's estate without specific authorization (*Estate of Burke* (1926) 198 Cal. 163, 166 [244 P. 340, 44 A.L.R. 1341]; *California Emp. etc. Com.* v. *Hansen* (1945) 69 Cal.App.2d 767, 770 [160 P.2d 173]), the executor's mere retention of the Reserve shares in the instant estate did not amount to carrying on a trade or business. In *Mellier's Estate* (1933) 312 Pa. 157 [167 A. 358, 92 A.L.R. 430], the administrators were surcharged for refusing to close out securities margin accounts upon the demand of a

normally is not held to account for failure to anticipate fluctuations in the price of a publicly traded stock arising from general market conditions, as distinct from conditions peculiar to the company in which the stock is held. (*Estate of Kent* (1936) 6 Cal.2d 154, 164-165 [57 P.2d 901]; cf. *Day* v. *First Trust & Sav. Bank* (1941) 47 Cal.App.2d 470, 479 [118 P.2d 51].) There was evidence that the decline in the value of the Reserve stock reflected a decline in the market price of oil stocks generally (see fn. 7, *ante*) and that the executor used reasonable care to become informed about any special circumstances that might affect the value of the stock. Thus, the evidence showed that during the initial two weeks of probate administration and periodically thereafter until distribution the executor ascertained through the research facilities of its investment department, staffed by security analysts and other experts, that there was no deterioration in the financial condition or management of Reserve which would indicate the existence or prospect of a substantial loss of intrinsic value. This evidence supported the trial court's finding that "Reserve Oil & Gas Company was not in a deteriorating condition at any time during the probate of this estate and the [executor] so determined in the course of considering whether to retain any shares of the common stock of said corporation in the estate."

■ In addition to the executor's duty to preserve the estate assets, a second area ot its responsibility necessarily affecting the contestants' interests in the trust was its selection of which assets to sell to raise the cash needed by the estate and which to retain for distribution into the trust. Contestants attack the executor's sales of short term government bonds authorized by the probate court in June 1969 along with the sale of part of the Reserve holdings. They argue that the executor was negligent in not obtaining the needed cash entirely from a larger disposition of Reserve instead of partly from Reserve and partly from the bonds.[16] To have retained the bonds for distribution to the trust would have been nearly equivalent to retaining cash for this purpose as the

---

putative widow whose claim against the estate had been settled by an agreement to pay her a cash amount and who demanded that in a falling stock market the accounts be liquidated at a point at which the remaining value would suffice to satisfy her claim. (Cf. § 754 (authorizing sale of estate property when "necessary" to pay debts, legacies, family allowance or expenses), § 758 (any person interested may petition for order requiring executor or administrator to make a necessary sale).)

[16]Contestants do not contend that sales of additional Reserve should have been substituted for the sales of the decedent's residence and other real estate by which the estate was relieved from expenditures for taxes and insurance. (See fn. 4, *ante.*) The residence was not needed or wanted by surviving family members and until sold was occupied by caretakers compensated from the estate.

maturity dates of the bonds made it probable that some and perhaps all would be converted to cash before administration of the estate was completed.[17] As previously stated, there was evidence that the executor in deciding not to obtain cash from selling additional shares of Reserve took into account the suitability of that stock for inclusion in the trust, based on the trust's terms, the circumstances and resources of the beneficiaries, the income produced by trust assets other than Reserve, the propriety of capital growth as one of the trust objectives, and a judgment that Reserve stock had long-term potential for increase in value. This evidence supports the trial court's finding set forth in footnote 12, *ante,* that the executor exercised due care in deciding to retain the stock for distribution to the trust.

A third area of the executor's responsibilities having at least a potential effect on the contestants' interests as trust beneficiaries was the timing of the distribution of particular assets from the probate estate into the trust. Upon such distribution the management of the Reserve stock was freed from the restrictions imposed by the executor's multifarious duties and limited powers and became subject to the broad powers conferred upon the trustee by the terms of the trust.[18] "It is the established policy of this state, implemented by sections 1000 and 1001 of the Probate Code, to encourage the distribution of property to legatees as soon as can be done without jeopardizing the rights of others interested in the estate. [Citations.]" *(Estate of Toler* (1957) 49 Cal.2d 460, 467 [49 Cal.2d 460, 319 P.2d 337]; accord, *Estate of Hogemann* (1965) 63 Cal.2d 131, 136 [45 Cal.Rptr. 149, 403 P.2d 405].) Although contestants as trust beneficiaries had standing to petition for preliminary distribution to the trustee *(Estate of Mackay* (1895) 107 Cal. 303, 307 [40 P. 558]; *Estate of McGirl* (1932) 125 Cal.App. 310, 313 [13 P.2d 746]), the executor's duty to avoid unreasonable delay in distribution was not dependent on the initiative of a beneficiary. *(Estate of Taylor* (1967) 66 Cal.2d 855, 858-859 [59 Cal.Rptr. 437, 428 P.2d 301].) The record shows that the executor in fact obtained authorization for preliminary distribution of the Mother Lode Bank stock from the estate to the trust in April 1969 (see fn. 8, *ante)* and indicates no obstacle to preliminary distribution of the Reserve stock if its earlier subjection to trust management had been deemed advanta-

[17]About ha.f of the proceeds from the bond sales was produced by bonds maturing no later than February 1, 1970, and the remaining half came from bonds maturing no later than September 1, 1970. The petition for final distribution was filed July 22, 1970, and distribution of substantially all remaining assets was ordered on September 28, 1970.

[18]Four pages of the decedent's will were devoted to the listing of powers conferred upon the trustee "in addition to those now or hereafter conferred by law."

geous.[19] However, there was no evidence that earlier distribution of the Reserve stock would have resulted in its being sold by the trustee at any price higher than its market value at the time it was in fact distributed.

### Right to Jury Trial

■ Contestants claim the trial court erred in not ordering a jury trial of the factual issues raised by the contest. The executor asserts contestants waived any right to a jury trial by failure to make timely demand therefor. We need not pass on the waiver issue in view of our conclusion that even if the jury trial claim was effectively asserted it was properly denied on its merits.

■ There is no right to a jury in probate proceedings unless that right is granted by statute. (*Estate of Van Deusen* (1947) 30 Cal.2d 285, 291 [182 P.2d 565]; *Estate of England* (1931) 214 Cal. 298, 300 [5 P.2d 428].) Thus there are express statutory provisions for the right in will contests before probate (§ 371) and after probate (§ 382), contests of allowed claims (§ 928), determinations of rights to distribution (§ 1081), and hearings on restoration of "incompetent" persons to capacity (§ 1471) and termination of conservatorships (§ 1755).

■ Urging a broader right to a jury, contestants refer us to a line of cases construing the Probate Code and predecessor sections of the Code of Civil Procedure as granting a right to a jury trial in certain other probate proceedings in which the code expressly authorizes the formation of issues of fact to be tried. (See, e.g., *Estate of Perkins* (1943) 21 Cal.2d 561, 566-567 [134 P.2d 231] (final distribution).) However, no California appellate decision has declared or recognized any right to a jury trial in the kind of proceeding now before us—the resolution of exceptions to an executor's or administrator's account. To the contrary this court has consistently rejected any such right. (*Estate of Smead* (1938) 12 Cal.2d 20, 25 [82 P.2d 182]; *Estate of England, supra,* 214 Cal. 298; *Estate of Franklin* (1901) 133 Cal. 584 [65 P. 1081]; *Estate of Sanderson* (1887) 74 Cal. 199, 204-210 [15 P. 753]; *Estate of Moore* (1887) 72 Cal. 335, 338-340 [13 P. 880].)

---

[19]There was nothing apparent in the record to prevent distribution of the retained Reserve stock to the trustee as soon as the estate's cash needs had been satisfied by the sale of government bonds, Reserve debentures, and 3,000 shares of Reserve stock authorized in June 1969. The petition for final distribution filed July 22, 1970, showed that property appraised at $1,111,765.38 (including 24,700 shares of Reserve appraised at $348,887.50) was then on hand in the estate for distribution to the trust, subject only to minor obligations for remaining executor's and attorneys' fees and closing costs.

Contestants point out that the early *Moore* decision was based in part upon the impracticability of requiring "a jury to wade through, comprehend, and disentangle a long account, or to express an intelligent judgment upon each item" (72 Cal. at p. 338) and argue that the issues in the instant case of whether the executor was negligent in retaining the Reserve stock and if so the amount of resultant damages to the estate were relatively clearcut and as fully appropriate for jury consideration as the fact issues in regular civil actions for negligence or professional malpractice. However, there is another characteristic of claims for mismanagement of a probate estate which makes jury resolution inappropriate. Such claims, unlike ordinary claims for negligence or malpractice, are necessarily based on conduct that is subject to the independent control and supervision of the very court before which the claim must be asserted. As we said in *Estate of Sanderson, supra,* 74 Cal. 199, 208: "There may be a manifest propriety in requiring, at the request of a party, issues of fact such as ordinarily arise in the contest of the probate of a will (Was the testator of unsound mind? Was he subjected to undue influence?) to be tried by a jury. But the proceeding in probate for the settlement of an account is *sui generis,* bearing but a distant and incomplete analogy to the procedure for an accounting in equity. The executor or administrator derives his power to act as such from the will, or order of the court; but in his conduct of the affairs of the estate, he is subjected largely to the discretion and control of the court. The court is bound to protect the estate, and, as far as may be, the rights of all concerned. Publication is had, that all interested may have an opportunity, by written exceptions, to call the attention of the court to alleged errors or defects; but, in the absence of exceptions, the court may and should inquire into any matter which may seem to the court objectionable, and pass judgment thereon; and in the presence of specific objections, the court is not limited to the specific objections." (See also *Estate of Randall* (1922) 188 Cal. 329, 335 [205 P. 118].) In short, to subject the court's determination of the propriety of an executor's acts in the course of administering the estate to contradiction by a jury verdict would tend to dilute and undermine the court's ongoing responsibility for detecting and correcting executorial mismanagement.

Finally, a legislative intent to disallow any right to jury trial in the present proceeding is implied by section 928, which expressly grants a right to a jury for exceptions to allowed claims, thus indicating exclusion of the right for other exceptions to an account under section 927, as in the present proceeding. (*Estate of England, supra,* 214 Cal. 298, 300.)

The trial court had discretion to impanel a jury to render an advisory verdict on issues raised by contestants' exceptions to the account. (*Estate of Moore, supra,* 72 Cal. 335, 339.) However, the court's absolute power to disregard any verdict that a jury might have returned renders pointless any examination on appeal of the denial of contestants' request for an advisory jury. (*Stearns* v. *Los Angeles City School Dist.* (1966) 244 Cal.App.2d 696, 725-726 [53 Cal.Rptr. 482].)

### Extraordinary Compensation of Executor and Executor's Attorneys for Defense Against Contests

The principal judgment rejecting contestants' exceptions to the executor's account included provisions (1) reserving jurisdiction to determine the value of the extraordinary services of the executor's attorneys in defending against the contests, (2) awarding the executor $2,500 for extraordinary services in such defense, and (3) ordering that all extraordinary compensation awarded the executor and its attorneys for such defense be charged against contestants' shares of the testamentary trust. Subsequently a petition of the executor's attorneys for extraordinary compensation of $23,665 was filed and heard by the court, which thereupon awarded them $14,500 for their defense of the contests. Contestants have appealed from this order as well as from the principal judgment.

Contestants' initial objection to these awards is that the costs of defense should have been borne by the executor itself without reimbursement from the estate on the theory that such defense benefitted the executor and not the estate. The expenditures were for the purpose of protecting the executor from unjust surcharge for conduct in the administration of the estate which the present proceeding has determined to have been perfectly proper. Such expenditures for an executor's or administrator's successful defense against exceptions to his account are chargeable against the estate. (*Estate of Beirach* (1966) 240 Cal.App.2d 864, 866-868 [50 Cal.Rptr. 5]; *Estate of Raphael* (1954) 128 Cal.App.2d 92, 97 [274 P.2d 880].)

Contestants question the amounts of the extraordinary compensation awards. The trial court's findings state that the award of $2,500 to the executor was for answering interrogatories, attending depositions of five witnesses (three of whom were bank employees), conferring with attorneys in preparation for depositions, interrogatories, and trial, and attending the six-day trial. The executor's attorneys were a partner and

an associate of a law firm. The award to them of $14,500 was based not only on the trial court's observation of the contest proceedings but also upon an evidentiary hearing at which the attorneys submitted time records itemizing the services of their firm in the matter and showing that they would be entitled to compensation of over $24,000 based on hourly rates of $70 for the partner, $40 for the associate, and $15 for law student research clerks. In fixing the amount of extraordinary compensation for the executor and its attorneys the court could properly consider not only the time spent but also such factors as the value of the estate, the skills exercised, the amount in dispute, and the results obtained. (*Estate of Lanza* (1964) 229 Cal.App.2d 720, 726-727 [40 Cal.Rptr. 528]; *Estate of Walker* (1963) 221 Cal.App.2d 792, 795 [34 Cal.Rptr. 832]; *Estate of Merritt* (1950) 98 Cal.App.2d 70, 76 [219 P.2d 40].) The awards must be upheld unless they appear so clearly out of proportion to the services performed as to be an abuse of discretion. (*Estate of Taylor, supra,* 66 Cal.2d 855, 860; *Estate of Turino* (1970) 8 Cal.App.3d 642, 649 [87 Cal.Rptr. 581].) The amounts of the present awards were within the court's discretion.

### Chargeability of Defense Expenditures Against Contestants' Shares of Trust

█ The trial court exceeded its authority in ordering that the extraordinary compensation of the executor and its attorneys for defending the contests be charged against contestants' shares of the trust. The residue of the estate was distributed in trust for four beneficiaries of whom only three filed the present contests. Probate Code section 750 provides in effect that in the absence of contrary provision in the will debts and expenses of administration must be paid from the estate in the following order: (1) "that portion of the estate not disposed of by the will," (2) "property given to residuary legatees and devisees," (3) "all other property devised and bequeathed" other than by specific devise or legacy, and (4) "specific devises and legacies." There being no property of the estate passing by intestacy, the expenses of administration, including the extraordinary compensation in question, were chargeable generally against all the property otherwise distributable to the residuary trust without differentiation as to the burden to be borne by any beneficiary's particular interest. (See *Estate of Stauffer* (1959) 53 Cal.2d 124, 129-131 [346 P.2d 748].)

The executor seeks to sustain the charging of extraordinary compensation against contestants' trust shares by arguing that "[i]t would have

been manifestly unfair for a noncontesting beneficiary to participate in the burden of that expense incurred by the contesting beneficiaries," and that "[t]he allocation of fees and costs is fully supported by the broad equitable discretion of the trial Court in assessing such fees and costs to the respective parties." The trial court had discretion to charge contestants with costs of suit (§ 1232) and acted within this authority in awarding such costs against contestants in the amount of $774.47. However, the court's authority to award costs did not include power to impose upon contestants the entire burden of the extraordinary compensation of the executor and its attorneys for conducting the executor's defense against the contests. (Code Civ. Proc., § 1021; *Estate of Marré, supra,* 18 Cal.2d at p. 191; *Estate of Harvey* (1964) 224 Cal.App.2d 555, 561 [36 Cal.Rptr. 788]; *Estate of Bevelle* (1947) 81 Cal.App.2d 720 [185 P.2d 90].) A contrary rule would unduly deter contestants such as these from questioning the stewardship of executors and administrators through proceedings brought in good faith.

### Interest on Deferred Payment of Executor's Compensation

In its order of September 28, 1970, settling the executor's account except as to issues raised by the contests, the probate court approved $8,210.50 as the remaining balance of the executor's statutory compensation (§ 901) and $7,750 as extraordinary compensation to the executor for services rendered on or before September 4, 1970, but provided that payment of these amounts should not be made until the contests were concluded. The judgment on the contests entered August 1, 1972, now before us, provides "that interest in the sum of $1,955.17 computed at the rate of 7% per annum on the withheld balance of statutory compensation and extraordinary services for [the executor] pursuant to this court's order of September 28, 1970, which interest is computed from said date to the date hereof is allowed [the executor]."

This allowance of interest was error. It is settled that noncontractual interest on a creditor's claim against an estate does not begin to run when the claim is allowed but only when it is ordered paid. (*Palmer v. Gregg* (1967) 65 Cal.2d 657, 661 [56 Cal.Rptr. 97, 422 P.2d 985]; *Hilton v. McNitt* (1957) 49 Cal.2d 79, 83 [315 P.2d 1].) An analogous principle precluded any award of interest on allowances of executor's compensation for a period during which payment had been expressly ordered deferred pending occurrence of a future event.

The judgment of August 1, 1972, is modified by striking therefrom the provisions for (1) charging extraordinary compensation of the executor and its attorneys "against the principal share of the Contestants' trusts" and (2) allowing interest on the withheld amounts of executor's statutory and extraordinary compensation allowed in the order of September 28, 1970. As so modified, the judgment is affirmed. The order for payment of attorney's fees for extraordinary services, dated and filed on November 17, 1972, is affirmed. Each party shall bear its own costs on appeal.

McComb, J., Tobriner, J., Mosk, J., Sullivan, J., Clark, J., and Taylor, J.,* concurred.

Appellants' petition for a rehearing was denied January 14, 1976. Richardson, J., did not participate therein.

---

*Assigned by the Chairman of the Judicial Council.