43 Cal.2d 437 (1954)
Estate of HERBERT R. MACMILLAN, Deceased. R. S. MACMILLAN et al., Appellants,
v.
ALICE M. DOCKWEILER, et al., Respondents.
L. A. No. 22752. 
Supreme Court of California. In Bank. 
Oct. 15, 1954.
 Guy Richards Crump and Wood, Crump, Rogers, Arndt & Evans for Appellant R. S. Macmillan. *438
 Ernest R. Purdum, Guy Richards Crump and Fred M. Cross for Appellant Gordon Macmillan.
 William K. Young for Respondents.
 SCHAUER, J.
 These are two appeals, prosecuted on the same record, from separate portions of an order which settles the final account of the administrator of the estate of Herbert R. Macmillan, deceased, and decrees distribution of the estate. The appeal of Gordon Macmillan, one of the four heirs of decedent, attacks the portion of the order which, in effect, distributes the entire estate in equal shares to the three heirs other than Gordon. The appeal of R. S. Macmillan, administrator, attacks the portion of the order which surcharges the account of the administrator in the sum of $12,956.99.
 The problems presented by each appeal are independent of those raised by the other. We have concluded that each appellant has shown that the portion of the order which he attacks is erroneous and that such order, in the portions appealed from, should be reversed.
 The determination that Gordon is entitled to no distribution of assets results from the erroneous conclusions (a) that the administrator should not have used income from an interest in certain property (an oil lease which, at least in part, was held in trust by Gordon, the beneficial interest being duly inventoried in the estate) to pay debts of decedent and expenses of administration, and (b) that what would otherwise have been Gordon's distributive share of the estate should be set off against the amount of income so used by the administrator. The surcharging of the administrator's account results from the untenable holdings (a) that the amount of estate income taxes for which the estate became liable, and for the payment of which the administrator claims credit in his accounts, includes an "unnecessary and exorbitant" liability of $12,956.99, and (b) that this expense would not have been incurred if the administrator had not negligently failed to protect the interest in the lease despite his knowledge of misfeasances of Gordon, as trustee, with resulting loss to heirs of the estate in the amount fixed. Actually, there is some evidence that the administrator knew of and condoned some irregular conduct of Gordon in his operation and management of the trust, but there is no evidence that the administrator negligently caused or allowed the estate to become liable for income taxes in the sum ($12,956.99) surcharged to his account. *439
 In 1945 Herbert R. Macmillan died intestate. His four heirs are his sons Gordon and Malcolm, his daughter Alice M. Dockweiler, and a grandson Herbert M. Booth, the minor child of a predeceased daughter. The net appraised value of his estate is about $97,000. Its principal assets are a 47 per cent interest (appraised at $70,500) in an oil lease known as the Thrash lease (which is the subject of the trust estate managed by Gordon) and 1,918 shares of stock (appraised at $21,098) of Macmillan Petroleum Corporation.
 In 1931 Gordon and decedent had acquired and begun to develop and operate the Thrash lease. Legal ownership of the lease was taken and has since been held by Gordon as trustee. The amount of the respective undivided beneficial interests of decedent and Gordon in the lease became a subject of dispute between them which remained unsettled at the time of decedent's death.
 After decedent died and R. S. Macmillan (a surviving brother) was appointed administrator of his estate, Gordon filed certain creditor's claims in the probate proceeding, both as individual and as trustee of the Thrash lease; also there was controversy among the parties to this appeal as to what interest in the lease was the individual property of Gordon and what interest was estate property. These matters were the subject of a compromise agreement executed on April 19, 1946, by Gordon, both as an individual and as trustee of the lease, and by the administrator. This agreement was approved by the probate court. It recites that there was a dispute then pending between Gordon and the administrator as to the respective interests of Gordon and the estate in the lease and lists and provides for settlement of monetary claims of Gordon. [fn. 1] The portions of the agreement which are here material purport to settle the interests of Gordon and the other Macmillan *440 heirs in the Thrash lease. Although the heirs other than Gordon did not join in the agreement, they do not dispute its validity as to them, but only its effect. According to the recitals and covenants of the agreement, the respective interests of the beneficial owners in the lease and production therefrom are as follows:
 Tabular Material Omitted [fn. 2]
 The 1946 agreement contains the following language:
 "Gordon Macmillan will execute a declaration of trust ... to the effect that he holds 47 per cent undivided interest in the Thrash lease in trust for the heirs of Herbert R. Macmillan, deceased, other than himself."
 "... [The administrator] will quitclaim to Gordon Macmillan all right, title and interest of the estate ... in the Thrash lease or the production therefrom, other than the 47 percent undivided interest held in trust by Gordon Macmillan ..."
 "Gordon Macmillan waives any and all rights which he has or may have to participate as an heir or distributee in the matter of the estate of Herbert R. MacMillan, deceased, in and to such 47 percent, and hereby assigns all his interest therein, as heir or otherwise, to the other heirs of Herbert R. Macmillan, deceased, share and share alike."
 We note, parenthetically, that Gordon did not execute any declaration that he held a 47 per cent interest in the lease in trust, and that the administrator did not quitclaim to Gordon all interest of the estate other than the 47 per cent, but the parties to this proceeding make no point of these omissions and we therefore disregard them.
 After the making of the 1946 agreement Gordon continued to act as trustee and operator of the Thrash lease. The 47 per cent interest in the lease was the only asset from which *441 the estate received any substantial income. Income received by the estate during the period of probate (1945- 1952) was about $131,900. Included in this income was $124,333.82 paid over by Gordon as dividends accruing to the 47 per cent interest in the lease. The debts of decedent allowed and paid by the administrator and the expenses of administration of the estate amounted to about $134,900.
 The accounts current and the final account, report and petition for distribution filed by the administrator show that he charged himself with the above mentioned assets and income, credited himself with the debts and expenses, and proposed to distribute the 47 per cent interest in the lease in equal shares to the three heirs other than Gordon and the remainder of the estate assets in equal shares to the four heirs. Alice M. Dockweiler and Herbert M. Booth, respondents here, filed exceptions to the final account and report. After hearing, the trial court accepted the theories of two of the exceptions and made findings and conclusions which underlie the portions of the order from which the present appeals are taken.
 The trial judge stated his reasons for the conclusion that Gordon was entitled to no share of the estate in the following manner: According to a memorandum opinion, the amount (which the judge calls "general assets") available to the administrator to pay "general debts and costs of administration" [fn. 3] is the "appraised value of assets other than Thrash lease, plus income other than from Thrash lease." "Debts and expenses chargeable to general assets" exceed "general assets" by $37,128.85. According to the findings, "it is true that while [income from the 47 per cent interest in the lease] ... was subject to the claims of creditors, expenses of administration and taxes, the same belonged to the decedent's heirs, excepting Gordon Macmillan, subject to administration. The court finds that the sum of $37,128.85 was disbursed from said Thrash lease income to pay the general debts and costs of administration of said Estate, and that the said sum should be considered as a loan to the Estate from the heirs, other than Gordon Macmillan, which should be repaid to them *442 pro tanto from other assets of the Estate." The "other assets of the Estate" (i.e., the assets which the administrator proposed to distribute in equal shares among all four heirs, including Gordon) amount to less than the so-called "loan to the Estate" from the three heirs. When such "loan" is "repaid ... pro tanto" by setting off the "other assets" against it, nothing remains for distribution to Gordon.
 The following chronological restatement of what occurred to the property which comprised the estate of decedent, with the rules of law applicable thereto, impels us to the view that we cannot sustain the foregoing reasoning and conclusion.
 [1] When decedent died intestate, title to his property passed to his four heirs subject to "the expenses of administering his estate, and the payment of his debts ..." (Prob. Code, 300.) Among the property of decedent which passed to his heirs was an interest in the Thrash lease. The quantum of such interest was disputed by Gordon, who advanced a claim of interest in the lease adverse to the estate. Gordon and the administrator, with the approval of the court, compromised the dispute by agreeing that Gordon would make no claim adverse to the estate to a 47 per cent interest in the lease; furthermore, as part of the compromise agreement, Gordon transferred to his three coheirs all his interest as heir of decedent in such 47 per cent and its production.
 [2] In this proceeding it is not questioned that the amount of interest which passed from decedent to his heirs was 47 per cent. The interest in the 47 per cent which Gordon as heir transferred to the three coheirs was only such interest as he had; i.e., it was subject to the debts of decedent and expenses of administration. (See, e.g., Blair v. Hazzard (1910), 158 Cal. 721, 725 [112 P. 298]; Smith v. Barrick (1919), 41 Cal.App. 28, 31 [182 P. 56]; Estate of Dobbins (1940), 36 Cal.App.2d 536, 541 [97 P.2d 1051].) There is nothing in the compromise agreement which purports to provide that the income from any portion of the 47 per cent should be exempt from the ordinary course of administration or that the expenses of administration should be charged solely to particular persons or funds.
 The administrator prepared his accounts in the usual fashion. He charged himself with the assets of the estate, including the 47 per cent interest in the lease, and with the income which he had received from that interest (Prob. Code 920: "Every ... administrator is chargeable in his accounts with all of the estate of decedent which comes into *443 his possession, and with all the income, issues and profits of the estate ..."). He sought credit for debts allowed and paid and for expenses of administration, including income taxes for which the estate became liable during the course of administration (Prob. Code, 900: "The ... administrator shall be allowed all necessary expenses in the care, management and settlement of the estate ..."). As previously indicated, the trial court concluded that "the administrator is subject to a surcharge of $12,956.99 arising by reason of his negligence." Discussion of the administrator's contention that the trial court erred in surcharging his account in this amount (found to be "unnecessary and exorbitant income taxes") requires a statement in further detail of the evidence as to the income from the Thrash lease which was paid to the administrator and the taxes on such income. Much of the findings and briefs concern Gordon's operation of the Thrash lease and his management of the trust and the administrator's knowledge thereof and create the general impression that the trust and the estate may have been handled, at best, rather casually, [fn. 4] but they do not show that conduct of Gordon, much less conduct of the administrator, was the cause of a $12,956.99 unnecessary expense being incurred by the administrator and therefore do not support the order surcharging the administrator in that amount.
 After the administrator and Gordon had agreed, in 1946, that the interest in the Thrash lease which passed to the heirs of decedent was 47 per cent, so that Gordon as operator of the lease and as trustee had a basis for determining what proportion of the income from the lease should go to the estate, Gordon paid to the administrator dividends which, as stated, are shown in the administrator's accounts as totaling $124,333.85. [fn. 5] *444
 In 1951 respondents, dissatisfied with the administration of the estate, brought an independent action against Gordon, as trustee, and the administrator in which they complained of various asserted delicts in the management of the trust and the estate and, in the words of the administrator, "put the pressure on to get this estate closed." The administrator discussed with Gordon the payment of the 1951 dividend and the closing of the estate. The administrator testified that in 1951 "I had asked Gordon to pay a dividend and he decided to pay a big dividend, and I was worried about a big income tax and where I was going to get it from." Gordon testified that "there was a discussion as to the amount of tax that would be necessary to pay if a full dividend were paid, and I was requested [by the administrator] to hold it up ... until such time as they [the administrator, the administrator's attorney, and respondents] had an opportunity to go over it and discuss it."
 Gordon prepared two sets of 1951 dividend checks, one which included a check to the estate for the amount which was thereafter actually received by it and one which comprised checks for smaller dividends, and sent both sets to a bank which handled the mailing of the checks to the beneficiaries, with instructions that both sets of checks be held until Gordon advised which set was to be sent to the beneficiaries. According to Gordon's testimony, "It was decided that it would be better to pay the partial amount instead of the full amount in December of '51, and then pay the other part of it after the first of the year of '52 ... I communicated with the bank ... to send out ... the smaller dividend. ... By some error, the bank ... had already sent out the larger one and it had been put in the mails and there was no way for me to stop it." As appears from the tabulation following the next succeeding paragraph, it is this large payment in 1951 which constitutes the principal item in the re-accounting process by which the trial court reached the conclusion that the administrator's account should be surcharged in the sum it fixed.
 An expert witness for respondents, an attorney and certified public accountant, examined the administrator's accounts and the books of Gordon as trustee and prepared compilations of items shown therein which were accepted by the trial court as a basis of its order which surcharges the administrator in *445 the amount of $12,956.99. The following chart shows the figures compiled by the expert and accepted by the trial court. The term "assumed dividends" which appears in the chart is used by respondents to designate the income which they contend that Gordon as trustee should have distributed to the estate and the term "adjusted taxes" is used to designate the taxes which would have accrued had such income been paid. The trial court determined that Gordon could and should have paid the "assumed dividends" and that the administrator should have required him to do so; had this been done, the annual dividends over the years of probate would have been more nearly equal and the total income taxes incurred by the estate would have been $12,956.99 less than the amount actually incurred.
 Tabular Material Omitted
 The expert testified, in effect, that he did not undertake to decide what dividends Gordon as trustee should have paid in the exercise of his discretion in the light of circumstances as they existed at the respective times of the several payments; he simply pointed out what dividends the estate would have received if, each year, Gordon had disbursed to the estate its proportion of the cash which book entries showed was in the trust and had cancelled any indebtedness of the estate to the trust; in arriving at "assumed dividends" the expert assumed that the estate would be kept open "for the approximately eight-year period that it has been kept open, seven years"; in arriving at an annual income from dividends which would result in the lowest possible total income taxes over such period he took into consideration only the income tax requirements of the estate, not those of other beneficiaries of the trust of whose tax requirements he knew nothing.
 The respective positions of the parties as to the propriety of the surcharge are stated by respondents in their brief as follows: "Appellant [administrator] argues that under the rule *446 relating to the discretionary power of a trustee, [fn. 6] appellant had no opportunity to control the manner in which Gordon exercised his duties as trustee. This is the general rule, subject to a few exceptions, but the rule has no application here. The prejudice which the estate suffered and resulting in the surcharge arose by reason of the appellant's indifference to and indulgence of the misappropriations of the trustee and the latter's consequent incapacity to properly function with respect to the payment of proper and regular dividends."
 Respondents assert generally that the administrator failed in his duties to exercise prudence and diligence (citing Estate of Robl (1912), 163 Cal. 801, 802 [127 P. 55, Ann.Cas. 1914A 319]; Colden v. Costello (1942), 50 Cal.App.2d 363, 372 [122 P.2d 959]) and to prosecute actions necessary for the protection of the property of the estate (citing Landis v. First National Bank (1937), 20 Cal.App.2d 198, 207 [66 P.2d 730]). But such general propositions of law do not answer the administrator's contention that there is no evidence to support the finding that "by reason of the administrator's failure resulting from his negligence to require said trustee to distribute to the Estate its share of the net earnings of said trust as dividends, and as a result of the declaration and payment of a grossly disproportionate dividend to said Estate on December 13, 1951, in the sum of $44,769.38, said Estate was subjected to unnecessary and exorbitant income taxes, in the aggregate sum of $12,956.99, to the prejudice of the heirs of said decedent, excepting Gordon."
 [3] As previously indicated, there is evidence that the administrator was generally lax in failing to prevent known delicts of the trustee, but there is no evidence that any action on the part of the administrator could have and should have resulted in a tax saving in the amount of the surcharge. The figures accepted by the trial court as the basis of the surcharge do not take into consideration the internal affairs of the trust; for example, there is no evidence that payment of the "assumed dividends" would not have improperly impaired working capital, a matter for the decision of the trustee in his sound discretion. The administrator's general knowledge that from time to time the trustee, who was also the operating manager of the lease, was handling trust funds improperly *447 does not supply evidence that the administrator could have controlled such handling of funds by the trustee-manager either by request or by the use of legal process, to produce the payment of the "assumed dividends" at the optimum times. If the administrator's account is to be surcharged for a part of the income taxes incurred by the estate on account of income from the Thrash lease, it must be shown that negligence of the administrator proximately caused the unnecessary incurring of such taxes. For want of evidence to establish the essential elements above indicated the surcharge here must fail.
 For the reasons above stated, the portions of the order appealed from are reversed.
 Shenk, Acting C.J., Edmonds, J., Carter, J., Traynor, J., Spence, J., and Dooling, J. pro tem., [fn. *] concurred.
NOTES
[fn. 1] 1. The provisions of the agreement which concern Gordon's monetary claims are not in dispute on this appeal. They are mentioned here only because they are one indication that the appeal deals with only portions of the controversies connected with the Thrash lease and the estate in which appellants and respondents have been and are involved. The agreement recites that Gordon filed two creditor's claims, one for $53,200 as an individual and one for $99,114.78 as trustee, and also claimed that he was entitled to $41,300 for his services as trustee of the lease from 1931 to 1945; and that the administrator is willing to recognize certain portions of the claims and intends to reject others. The settlement provisions include agreements that portions of Gordon's creditor's claims will be allowed and portions rejected. that Gordon as trustee will pay his claim for compensation out of future trust income, and that Gordon as an individual will make a loan to the administrator to be used for expenses of the estate; so far as appears these portions of the agreement have been performed without further dispute.
[fn. 2] 2. It may be noted that there is language in the agreement--that Gordon owns a 47 per cent interest "in trust ... for ... the estate of Herbert R. Macmillan"--which might tend to indicate an understanding that the 47 per cent interest belonged to the four heirs in equal shares; however, it is apparent from the balance of the agreement, and the parties to this proceeding do not dispute, that the 47 per cent interest belongs to the three heirs other than Gordon, and that the 30.666 per cent interest of Gordon represents his entire beneficial interest in the lease, both that which he might have claimed as an heir of decedent and that which he claimed to have owned even before decedent died.
[fn. 3] 3. In this computation of "debts and expenses" the trial judge omits income taxes of the estate. In a subsequent portion of the memorandum he explains this omission of what would ordinarily be an expense of administration in the following manner: He points out that the greater portion of income taxes of the estate is attributable to income from the Thrash lease and concludes that a portion of such taxes were "unnecessary and exorbitant."
[fn. 4] 4. As an example we may refer to a finding that, at a time not stated in the findings, "the administrator agreed with the trustee that the latter could use $25,000.00 of the trust funds to make a down payment on a ranch which the trustee was buying as a personal investment, if he would restore the money when requested to do so, and that pursuant to said agreement said trustee withdrew and used $25,000.00 of trust funds for said purpose." There is no evidence or finding that this misuse by the trustee of trust funds harmed any beneficiary of the trust or of the estate, or that it is in any way reflected in the administrator's accounts. Findings such as this support the trial judge only in so far as they indicate the failure of the administrator to protest against or protect the estate from the possible effect of known misuse by the trustee of trust funds which were part of estate assets.
[fn. 5] 5. In greater part such dividends were not paid in cash but were shown by book entries adjusting the various dealings among the administrator, Gordon as individual, and Gordon as trustee. Respondents make no particular point of this, although they mention that of the 1951 dividend of $44,769.38 to the administrator, he received cash of only $13,762.61.
[fn. 6] 6. The reference is to the rule that "the courts will not attempt to exercise discretion which has been confided to a trustee unless it is clear that the trustee has abused his discretion in some manner. [Citations.]" (Estate of Marre (1941), 18 Cal.2d 184, 190 [114 P.2d 586].)
[fn. *] *. Assigned by Chairman of Judicial Council.