[Civ. Nos. 47861, 48789. Second Dist., Div. One. Sept. 2, 1977.]

Estate of SADIE GERBER, Deceased.
SANTA MONICA BANK, as Trustee, etc., et al.,
Plaintiffs and Respondents, v
NORTHWESTERN NATIONAL CASUALTY COMPANY et al.,
Defendants and Appellants.

[Civ. Nos. 47862, 48790. Second Dist., Div. One. Sept. 2, 1977.]

Estate of STELLA GREEN, Deceased.
SANTA MONICA BANK, as Administrator, etc.,
Plaintiff and Respondent, v.
NORTHWESTERN NATIONAL CASUALTY COMPANY et al.,
Defendants and Appellants.

[Civ. Nos. 47863, 48791. Second Dist., Div. One. Sept. 2, 1977.]

Estate of BIRDIE FISHMAN, Deceased.
SANTA MONICA BANK, as Trustee, etc., et al.,
Plaintiffs and Respondents, v.
NORTHWESTERN NATIONAL CASUALTY COMPANY et al.,
Defendants and Appellants.

**COUNSEL**

Jones & Wilson, Robert E. Jones, William F. Flahavan and Stephen B. Grant for Defendants and Appellants.

Mink & Alpert, Michael S. Mink and Steven W. Murray for Plaintiffs and Respondents.

## OPINION

HANSON, J.—Northwestern National Casualty Company (hereinafter referred to as Northwestern) and Stuart A. Kagan appeal from a decree of the probate court settling the accounts of the executors of the wills of three decedents (Sadie Gerber, Stella Green, and Birdie Fishman) and surcharging appellant Kagan and his surety.

## FACTS

Stuart A. Kagan, who was admitted to the practice of law in California in 1960, was named executor in the wills of three sisters who were his clients, namely Sadie Gerber, Stella Green and Birdie Fishman. On March 20, 1970, Sadie Gerber died. Mr. Kagan petitioned for probate of her will and on May 20 he was issued letters testamentary on a $397,500 bond. On June 5, 1970, the Metropolitan News filed a declaration of publication of notice to creditors in the Gerber estate.

Stella Green (also known as Stella Simon) died on July 6, 1970, and Birdie Fishman (also known as Birdie Jacobson) died on January 25, 1971. On May 10 and May 18, 1971, Mr. Kagan petitioned for probate of the Green and Fishman wills, respectively. On October 29, 1971, both wills were admitted to probate. In November 1971 letters testamentary were issued to Mr. Kagan as executor in both probates with a $162,000 bond required in the Green estate and a $92,500 bond in the Fishman estate. A declaration of publication of notice to creditors was subsequently filed by the Metropolitan News in each estate.

Thereafter on September 9, 1971, Mr. Kagan substituted U. R. Gerecht as his attorney of record in place of himself in all three estates.

However, it is undisputed that Mr. Kagan undertook no further action as executor in any of the three named estates. Mr. Kagan opened only a temporary checking account for the Gerber estate and he never opened bank accounts for the Green and Fishman estates. Securities were among the assets of these estates and he placed the dividend checks in their unopened envelopes in a box unsegregated from other documents. Sadie Gerber's safety deposit box remained unopened by the county treasurer's office for some 21 months following her death. Mr. Kagan made no attempt to gather estate assets or to inventory them, to file tax returns, or to take any other customary steps required in the administration of estates. When one of the beneficiaries inquired of him the status

of the estates, he would report that all was well and he would soon be completed with the work. When he met with Elaine Gerber Austrian, her brother, Paul Gerber, and their parents in April 1971, he told them that nothing had been done because the tax attorney he had engaged to organize the estates had a nervous breakdown, and he obtained their consent for him to complete the work.

It was not until January of 1972 that Paul Gerber contacted attorney Steven W. Murray to determine why the probate of the three estates had not been completed. Mr. Murray investigated, discovered from the court files how little had been accomplished, and contacted Mr. Gerecht. Mr. Gerecht said that neither federal nor state tax returns had been filed, that the status of the inventories was unknown, and that he would agree to have someone else take over the probate of these estates. The beneficiaries subsequently authorized Mr. Murray to handle all matters relating to the estates. On February 18, 1972, he obtained the dual resignations of Mr. Kagan as executor and Mr. Gerecht as attorney for each of the three estates. The named successor executor in each of the three wills was Crocker National Bank which declined to act because of the disordered condition of the estates.

Ultimately Santa Monica Bank (hereinafter referred to as Bank) accepted nominations by the beneficiaries and on April 24, 1972, was appointed administrator with the will annexed for each of the three estates. On July 13, 1972, the probate court ordered the Bank to marshal the estate assets, review the acts of the former executor with respect to potential surcharges, associate special counsel to assist in any proceedings which might be brought against the former executor, complete United States income and estate tax and state income and inheritance tax returns and perform other services. Mr. Kagan thereafter met with Mr. Murray, a representative of Northwestern, Mr. Wilson, vice-president and trust officer of the Bank, and Mr. Malmberg of the Bank's trust department. At this meeting Mr. Kagan turned over to the Bank several cardboard boxes which contained various commingled documents including stock certificates, dividend checks in the original envelopes, saving and loan passbooks, checking account passbooks, bank statements, and miscellaneous papers belonging to the estates. The Bank sorted these documents, prepared inventories, and had courthouse records examined to determine what obligations of the decedents had been paid and which creditors claims had been filed.

On July 27, 1972, Mr. Kagan filed in each estate his first and final account and petition for allowance of statutory fees. The Bank filed exceptions, and prayed that Mr. Kagan be ordered to render a complete, true and verified account of his administration within 30 days, that no commissions or fees be awarded him, and that he be surcharged for all damages sustained by the estates and their beneficiaries, including all reasonable attorney's fees, costs and expenses. Continuances were thereafter from time to time granted to permit Mr. Kagan to conduct discovery but ultimately the court ordered him to file and serve a proper accounting on or before January 11, 1974. On January 10 he filed with the court a document entitled "Receipt for Property by Administrator CTA from Former Executor" and a pleading requesting that his previous waiver of fees and commissions be revoked and that he be awarded commissions and fees.

The surcharge hearing was conducted May 21 through May 28, 1974, and the Bank thereafter filed, as requested by the court, a post-trial legal memorandum setting forth all of the damages to which it claimed to be entitled as a result of Mr. Kagan's failure to administer the three estates. Northwestern also filed a post-trial legal memorandum on the issue of damages.

On February 18, 1975, the Bank filed its second and final account and report of administration and petitioned for final settlement of the three estates and for executor's commissions and attorneys' fees in each of the estates. These petitions were approved by the court. The court subsequently signed and filed findings of fact and conclusions of law with respect to the account of Mr. Kagan and the surcharges it imposed. In its final decree dated July 18, 1975, Mr. Kagan and Northwestern were surcharged as follows: $250,000 with respect to the Gerber estate, $60,000 with respect to the Green estate, and $22,000 with respect to the Fishman estate.[1]

On July 23 pursuant to petition the Bank as trustee and Paul Lee Gerber and Elaine Gerber Austrian as individuals were substituted in place of the Bank as executor, distribution having taken place to a testamentary trust established by the wills. Appeals were subsequently taken by Northwestern and Mr. Kagan.

---

[1] No written findings were prepared with respect to the specific items of damages which composed these total amounts.

## Issues

Appellants contend that there is no evidentiary basis for the amount of surcharges imposed since these must be limited to those losses suffered by the respective estates which were attributable to Mr. Kagan's breaches of·duty ·during the period he acted as executor. It is more specifically contended that the evidence does not support the following damages: (1) excessive surcharges imposed for losses due to delays in sale of securities in the Gerber and Green estates (a) for taxes, claims and expenses and (b) to preserve estate assets; (2) the surcharge for loss of alternate valuation date as against the Gerber estate; (3) the surcharge for interest accrued and paid on delinquent taxes in each estate; (4) the loss of inheritance tax discount in the Gerber and Green estates; (5) the loss due to duplicate payment of medical bills in the Gerber estate; (6) the loss of the 1969 income tax refund in the Fishman estate; (7) the loss from the refusal of the insurance company to reimburse the Fishman estate the full value of a lost or stolen ring; (8) statutory attorney's fees in each estate; and (9) extraordinary attorney's fees and executor's commissions in each estate.

## Discussion

### 1(a) *Sale of Stock to Pay Taxes, Claims and Expenses*

The major assets of Sadie Gerber's estate consisted of 17,874 shares of stock of a small midwestern bank known as Exchange National Bank of Chicago (hereinafter referred to as Exchange Bank) and the estate of Stella Green also contained 5,211 shares of its stock. The stock was traded irregularly on the over-the-counter market in Chicago, Illinois, and there was no regularly published information as to its price movements available locally. Appellants contend the executor was not properly surcharged for losses due to his failure to sell sufficient stock to pay taxes, claims and expenses promptly upon taking over administration and before the stock declined in value.

An executor or administrator may elect to use for purposes of federal estate tax computation the value of assets on the date of death or on the alternate valuation date one year later on filing timely notice. (Int.Rev. Code, § 2032.) As a result of Mr. Kagan's failure to timely file an estate tax return or apply ·for an extension of time the alternate valuation date election was· lost in both the Gerber and Green estates. The Green estate was not damaged since the value of its assets one year following Stella Green's death was higher than that at the date of death.

The Exchange Bank stock in the Gerber estate had a fair market value of $19.50 a share at the date of her death. It declined to only $14.50 a share one year later but because the alternate valuation date election was lost, the higher stock price was applied to value the estate for tax purposes. The evidence discloses that as a result $148,500 was required to pay federal estate taxes, state inheritance taxes, debts and expenses of administration whereas $117,000 would have been sufficient at the alternate valuation date one year later.

Mr. Wilson, an employee of the administrator Bank, and Mr. McCarroll, a specialist in the administration of estates, each testified that he would liquidate the number of shares required to produce sufficient cash to cover the estate's estimated cash requirements. These two experts testified that had Mr. Kagan acted promptly after Mrs. Gerber's death he would have needed to sell either 8,050 (Mr. McCarroll) or 5,500 (Mr. Wilson) shares of Exchange Bank stock at the higher prices then prevailing and could have used in addition the small amount of cash then in the estate to raise the $148,500 taxes actually paid. Instead the administrator with the will annexed was forced to sell after Mr. Kagan resigned a total of 12,767 shares of Exchange Bank stock at the then current market price of $9.50 per share to obtain this sum.

Stella Green died a few months after Sadie Gerber, leaving, among other things, 5,211 shares of Exchange Bank stock. The evidence disclosed that the cash needs for taxes and administration of this estate were approximately $23,955 which should have been met by liquidation of 1,710 shares of Exchange Bank stock several months following Stella Green's death when the market price was around $14 per share. In fact the administrator with the will annexed subsequently found it necessary to sell 2,011 shares of stock at $9.50 per share to obtain funds for this purpose.

Although there is no statutory requirement that an executor or administrator estimate taxes and expenses of administration and liqui-date assets sufficient in amount to cover such obligations within approximately six months following the date of death, the two expert witnesses testified that prudent estate administration calls for such action. ■ Substantial evidence in the record therefore supports the inclusion in the surcharge of losses sustained by the Gerber and Green estates as a consequence of Mr. Kagan's failure to take action to sell promptly sufficient shares to satisfy estimated taxes, debts and costs of administration. Since it is not possible to ascertain with assurance from

the general form of the findings how the trial court reconciled the testimony of Mr. Wilson and Mr. McCarroll as to the number of shares which should have been promptly sold and the amount which would have been realized per share, the precise damages attributable to this delay should be computed upon remand. ■ The appropriate measure of damages is the amount that would have been realized by Mr. Kagan on a prompt sale of sufficient shares to pay these anticipated expenses less a credit in the amount of the $9.50 per share which was actually realized when the shares were sold.

1(b) *Sale of Stock to Preserve Estate*

■ The Bank claimed additional losses to the Gerber and Green estates in the amount that should have been realized by the estates on prompt sale of the *entire remainder* of Exchange Bank stock to preserve the estates plus interest at 7 percent on the total until time of distribution. Appellants contend that losses due merely to fluctuations in the value of securities held by the decedent at the time of death should not be surcharged to the executor.

It is apparent that neither the evidence nor applicable legal principles support the surcharge to the executor for amounts that might have been obtained from sales of stock for purposes of asset preservation or interest which would have accrued on these sums over the three-year period of administration. ■ An executor or administrator is liable to reimburse the estate for legally compensable losses proximately resulting from his failure to exercise the requisite duty of care in administration (*Estate of Guiol* (1972) 28 Cal.App.3d 818 [105 Cal.Rptr. 35]). "[An executor] shall not make profit by the increase, nor suffer loss by the decrease or destruction without his fault, of any part of the estate. . . ." (Prob. Code, § 920.)

■ No evidence was presented in the present case to establish that Mr. Kagan knew or in exercising his duty as executor should have known of the existence of any facts which might lead a reasonable person to anticipate a decline in the value of the shares of Exchange Bank. ■ It is the duty of the personal representative to collect estate assets and preserve them until distribution, to pay claims against the estate including taxes and the charges of administration, and to distribute the residue to those entitled. He is accountable for all of the decedent's estate that comes into his possession and is chargeable with the losses resulting from his default or neglect (*Estate of Turino* (1970) 8

Cal.App.3d 642 [87 Cal.Rptr. 581]). ■ However, it is not the responsibility of the personal representative to insure that the value of the estate's assets will not fluctuate since ". . . unlike a trustee whose duty it is to invest all trust funds as soon as possible [citation], the primary duty of an executor is simply to preserve the estate until distribution. [Citation.] . . ." (*Estate of Smith* (1931) 112 Cal.App. 680, 685 [297 P. 927].)

The recent case of *Estate of Beach* (1975) 15 Cal.3d 623 [125 Cal.Rptr. 570, 542 P.2d 994], helps to clarify these distinctions. The will of Seth Beach, who died on August 4, 1968, leaving an estate valued at over $2 million, established a trust for his four children naming Bank of California both executor and trustee. In his estate there were 27,700 shares of stock in Reserve Oil and Gas Company (hereinafter referred to as Reserve) appraised at $14.125 per share at the date of death. The executor 10 months after his death sold 3,000 shares of Reserve at $16 per share to obtain cash for the payment of claims, taxes and expenses of administration. The remaining 24,700 shares were retained until September 1970 when they were distributed to the Bank of California as trustee under the testamentary trust. Their value at that time had declined to $6 per share. Three of the four trust beneficiaries contested the executor's first account claiming the estate was entitled to damages for the alleged negligence of the executor in failing to sell the Reserve stock while its market price was above its appraised value at the date of death. The trial court rejected the claims of the beneficiaries.

The California Supreme Court affirmed the trial court distinguishing the standard of care applicable to an executor from the standard applicable to a bank executor. "[T]he standard of care generally applicable to executors is 'that degree of prudence and diligence which a man of ordinary judgment would be expected to bestow upon his own affairs of a like nature.' (*Estate of Moore* (1892) 96 Cal. 522, 525 [31 P. 584]; *Estate of Barbikas* (1959) 171 Cal.App.2d 452, 457-458 [341 P.2d 32].) However, as a bank engaged in the business of acting as a fiduciary for estates and trusts (see Fin. Code, §§ 106-107, 1502), the executor could be held liable for negligence if it failed to exercise the skill and knowledge ordinarily possessed by such professional fiduciaries. (*Gagne v. Bertran* (1954) 43 Cal.2d 481, 489 [275 P.2d 15]; Rest.2d Torts, § 299A.)" (*Estate of Beach, supra,* 15 Cal.3d 623, 631.) The court further concluded that the evidence demonstrated that the bank fulfilled the applicable standard of care.

The court further concluded that the bank acting as executor was not held to the same standard as a trustee, despite the fact that it was named trustee under the will. The court noted that although an executor has a duty to take reasonable steps to preserve the assets of the estate which may require him to take affirmative steps to prevent deterioration in value, liability to sell securities before they depreciate in value has rarely been imposed upon an executor (*id.,* at p. 639; see also Annot., Liability of executor or administrator for loss by depreciation in value of securities, through retaining or deferring sale thereof (1933) 92 A.L.R. 436). "[T]he executor normally is not held to account for failure to anticipate fluctuations in the price of a publicly traded stock arising from general market conditions, as distinct from conditions peculiar to the company in which the stock is held. (*Estate of Kent* (1936) 6 Cal.2d 154, 164-165 [57 P.2d 901]; cf. *Day* v. *First Trust & Sav. Bank* (1941) 47 Cal.App.2d 470, 479 [118 P.2d 51].) . . ." (*Estate of Beach, supra,* 15 Cal.3d 623, 639-640.)

There is little evidence in the record relative to the action a nonbank executor might have taken with respect to the Exchange Bank stock. This was bank stock, generally regarded as a conservative investment and customarily traded over-the-counter. Mr. Wilson testified that he could not state an opinion as to whether Mr. Kagan's failure to sell any amount of this stock over and above that necessary to pay taxes and expenses constituted a breach of his duty of reasonable care. Expert testimony as to the actions which Bank or Mr. McCarroll, an expert in estate administration, might have taken is inapplicable (*Estate of Beach, supra,* 15 Cal.3d 623) since Mr. Kagan could not be held to this standard but only to a standard of reasonable care. Furthermore, there was no evidence that he could reasonably foresee or anticipate the decline in the stock's value. Notably the bank executor in *Beach,* despite active efforts to review and foresee the performance of Reserve shares, found itself holding them through a long period of gradual loss in value. The vagaries and vicissitudes of stock price action would tax the predictive capacities of an oracle and a decline could not be a reasonably foreseeable consequence of the executor's inaction in the present case.

The Bank included a claim for interest based on the assumption that the Exchange Bank stock should have been completely disposed of and the proceeds deposited in an interest-bearing account, since a representative is required to show that he has kept cash over and above that needed for orderly administration of the estate invested in interest-bearing accounts (Prob. Code, § 920.3; *Estate of Beach, supra,* 15 Cal.3d 623, 639,

fn. 14). Because we have determined that Mr. Kagan was not obligated to sell any Exchange Bank shares over and above the amount required to make prompt payment of taxes, claims and costs of administration in the Gerber and Green estates, the surcharge for interest does not constitute a proper surcharge against the executor in either estate.

### 2. *Loss of Alternate Valuation Date*

 The Bank claimed a loss to the Gerber and Fishman estates in the amount of the differential in taxes paid due to loss of the alternate valuation date of the estates for federal estate tax purposes. Appellants dispute only the amount of the surcharge for this loss in the Gerber estate.

The federal estate tax is computed on the value of the decedent's gross estate which is the value of all property at the date of death (Int.Rev. Code, § 2031). However, had the executor filed a timely election in the Gerber estate the value of the gross estate could have been determined, with respect to property retained in the estate, at its value 12 months after death in the estate of Sadie Gerber, who died March 20, 1970 (Int.Rev. Code, § 2032, subds. (a), (c)). As a consequence of Mr. Kagan's failure to take action with respect to the federal estate tax return, damages were suffered by the Gerber estate since the value of the assets in that estate declined in the interval between the date of death and the applicable alternate valuation date.

The testimony as to the amount of damages was conflicting. Mr. Murray, attorney for the administrator Bank, testified that the Gerber estate suffered a loss in the sum of $25,747, the difference between the $86,000 paid in federal estate taxes and the amount of $60,748 he computed on the basis of the lower value on the alternate valuation date. In reaching this conclusion, Mr. Murray assumed a sale of approximately 5,500 shares of Exchange Bank stock at a price of $16.75 per share within six months of Sadie Gerber's death to pay estimated taxes, debts and costs of administration. Northwestern points out that Mr. McCarroll assumed that 8,050 shares were sold at the higher valuation so that he estimated the loss at $24,150 yet he further testified that by a different method of computation the loss might have been reduced to $17,167.25.

 It is the function of the trial court to resolve conflicts in the evidence, including conflicts between the testimony of witnesses for the same party (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427 [45 P.2d

183]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920 [101 Cal.Rptr. 568, 496 P.2d 480]; *Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51 [107 Cal.Rptr. 45, 507 P.2d 653]). The appellate court ordinarily does not reweigh the evidence or resolve conflicts therein. ■ Since it cannot be determined how the trial court resolved the conflict in the evidence relating to the number of shares of Exchange Bank stock that should have been sold promptly following the death of Sadie Gerber or the amount lost due to loss of alternate valuation date, the court on remand shall reconsider and make appropriate findings as to these damages.

### 3. *Interest on Delinquent Tax Payments*

■ Interest charges were imposed on federal estate taxes, state inheritance taxes, and state and federal income taxes which were paid by the Bank after the delinquency dates on each of the three estates. Northwestern contends that because a substantial portion of the interest accrued after the Bank became administrator with the will annexed on April 24, 1972, surcharges were not properly imposed on Mr. Kagan. The evidence, however, supports the implied finding of the trial court that the accrued interest was attributable to the defalcation of Mr. Kagan prior to the time the administration was taken over by the Bank.

Interest at the rate of 6 percent per annum commences on the date the California inheritance tax becomes delinquent and continues at the same rate until it is paid (Rev. & Tax. Code, § 14211). For decedents dying before 6 p.m. December 8, 1971, the delinquency date was two years after the date of death. Thus for Sadie Gerber and Stella Green, who died during 1970, the delinquency dates were March 20 and July 6, 1972, respectively, and for Birdie Fishman, who died January 25, 1971, the delinquency date should have been January 25, 1973.[2] In the present case the same 6 percent interest rate applied for federal estate tax delinquencies. The delinquency date was 15 months following date of death for those who died before December 31, 1970, so that it was June 20, 1972, for the Gerber estate and October 6, 1972, for the Green estate. For those dying after December 31, 1970, the delinquency date was only nine months so that it was October 25, 1971, for the Fishman estate. (Int.Rev. Code, §§ 6151, 6601, subd. (a).)

The Bank was required to undertake the task of segregating assets and reconstructing amounts due as inheritance, estate and income taxes. It

---

[2]We note that the briefs apparently incorrectly state that the nine-month period provided by statutory amendment for the estates of persons dying after December 8, 1971, applied to the Fishman estate.

finally completed this task and paid state inheritance and federal estate taxes for all estates by the summer and fall of 1973. However, by that time interest charges had been incurred on delinquent state inheritance taxes and federal estate taxes and tardily filed fiduciary income tax returns.

Substantial evidence supports the implied finding that the foregoing interest charges were attributable to the inaction of Mr. Kagan following his appointment as executor. ■■■ "[A]n executor has the duty to preserve the estate's property by paying taxes legally imposed when there is sufficient money on hand for that purpose. (*Estate of MacMillan,* 43 Cal.2d 437, 447 [274 P.2d 662]; *County of Los Angeles* v. *Morrison,* 15 Cal.2d 368, 372 [101 P.2d 470, 129 A.L.R. 443].) . . ." (*Estate of Harvey* (1964) 224 Cal.App.2d 555, 557 [36 Cal.Rptr. 788].) ■■■ The delay which occurred after the Bank took over administration was also attributable to the former executor's nonfeasance and commingling of assets. It was necessary for the administrator to segregate and inventory the assets in the various estates, some of which were jointly held; the deaths of the three sisters occurred close together in time; and a period of more than two years had transpired since the earliest death, factors which rendered accounting difficult. Considering the disorganized condition of the various estates which was attributable to Mr. Kagan's failure to undertake the customary functions of an executor, the period of 15 to 18 months after its appointment within which the Bank paid was prompt, and the surcharge for interest due to tax delinquency is supported by the record.

4. *Inheritance Tax Discount*

■■■ The Bank claimed as items of damages in the Gerber and Green estates sums attributable to the executor's failure to obtain the 5 percent discount on the amount of inheritance tax available in estates of decedents dying prior to 6 p.m. December 8, 1971, if the payment was made within six months of the date of death (Rev. & Tax. Code, § 14161). By the time the Bank was appointed as administrator the discount period had elapsed and no inheritance taxes had been paid. According to the testimony of Mr. McCarroll the assets in the estates were sufficient and the executor should have obtained this discount.

Appellants argue that the executor has no duty to prepay taxes to obtain a discount since his duty is limited to paying tax indebtedness when it is due (*County of Los Angeles* v. *Morrison* (1940) 15 Cal.2d 368

[101 P.2d 470, 129 A.L.R. 443]). ■ However, as the testimony of Mr. McCarroll and Mr. Murray makes clear, the duty of the executor to conserve estate assets renders it incumbent upon him to take reasonable steps to determine the applicable tax law since among the most substantial expenses of estate administration are the tax obligations. ■ Accordingly, substantial evidence supports the surcharge for inheritance tax discount. Since the evidence was in conflict as to the appropriate amount, the method of computation must be determined by the trial court from the evidence in the record.

### 5. *Duplicate Payment of Gerber Creditor's Claims*

■ Appellants contend that the amounts of certain medical expenses incurred by Sadie Gerber during her last illness, together with interest thereon from date of payment by the Bank, were improperly included in the surcharge. There was evidence that the Bank inadvertently honored in the Gerber estate the $2,500 claim of Dr. Tremaine which had previously been paid by Mr. Kagan. Since substantial evidence supports the inference that the double payment occurred as a result of the disorder and confusion in the status of estate assets and claims, it cannot be said that this item was improperly surcharged.

### 6. *Loss of 1969 Fishman Income Tax Refund*

■ Contrary to the contentions of appellants, substantial evidence supports the claim of the Bank to $125.75 as surcharge for Mr. Kagan's failure to claim a refund of taxes due the Fishman estate. There was testimony that this income tax refund was due Birdie Fishman on the last tax return filed during her lifetime which was for the 1969 calendar year. This refund was lost because Mr. Kagan failed to make a timely claim.

### 7. *Loss of Claim Against Insurer for Fishman Ring*

■ Appellants contend that the trial court improperly imposed a surcharge of $1,547 against Mr. Kagan and his surety for failure to pursue an insurance claim relating to a ring lost by Birdie Fishman prior to her death. Evidence disclosed that Elaine Gerber Austrian, grandniece of Mrs. Fishman, told Mr. Kagan about the loss when it occurred in May 1970, about six months before Mrs. Fishman's death. Mr. Kagan testified that Mrs. Fishman also notified him of the loss and he advised her to contact her insurer, Insurance Company of North America (hereinafter referred to as I.N.A.). Mr. Murray, attorney for the administrator with

the will annexed, said he was requested by the Gerber family to explore the possibility of collecting insurance proceeds after the Bank took over estate administration in April 1972. When he contacted I.N.A., they admitted that the specific ring was insured by them and valued at $7,500, that they had received notice that the ring had been lost or stolen, and that they had received a copy of the police report relating thereto. The company denied liability, however, because no proof of loss had been filed within 60 days after notice. Mr. Murray through subsequent negotiations with I.N.A. eventually settled for the sum of $4,500 for the estate on the policy without filing proof of loss. Although he testified that the true reason for the failure to acknowledge full liability was the delay between the time of loss and the time I.N.A. received adequate information to verify the claim, there was no showing that the original delay was attributable to the inaction of Mr. Kagan in his function as executor. This item was therefore not a proper element of surcharge.

### 8. *Statutory Attorney's Fees*

The Bank as administrator claimed and the trial court impliedly found that surchargeable damages included statutory attorney's fees with respect to each of the three estates. (Prob. Code, §§ 901, 902.) Appellants contend that statutory attorney's fees are not proper items of surcharge (*Estate of Harvey, supra,* 224 Cal.App.2d 555, 561). Mr. Murray testified that he was told by Mr. Kagan that Mr. Kagan was named executor by each testatrix on his representation that he would save expenses of estate administration by acting as his own attorney. The Bank relies on this evidence to support its claim that attorney's fees are proper items of surcharge.

The Bank acknowledges that an attorney who is employed by an executor, at the executor's discretion, to represent the underlying executor's interest during the handling of estate administration is entitled to statutory attorney's fees payable from estate assets. However, it contends that if an executor performs his own legal work, he is entitled to receive only executor's commissions and not attorney's fees (*Estate of Graham* (1921) 187 Cal. 222 [201 P. 456, 18 A.L.R. 631]; *Estate of Hart* (1962) 204 Cal.App.2d 634 [22 Cal.Rptr. 495]). The fact that Mr. Kagan chose not to exercise his prerogative to employ an attorney for each of the estates does not impose upon him the duty of reimbursing the estates for statutory attorney fees, an ordinary expense of estate administration. Neither executor's commissions nor attorney's fees were awarded to Mr. Kagan on his petition. Attorney's fees were properly awarded to the

Bank, administrator with the will annexed, as expenses chargeable to the assets in the various estates and these were not proper items of surcharge.

### 9. *Extraordinary Attorney's Fees and Executor's Commissions*

Appellants further contend that extraordinary attorney's fees and executor's commissions are not appropriate elements of damages to be surcharged. The extraordinary fees and commissions awarded by the court fall into two categories: (a) those awarded in conjunction with the litigation relating to surcharge and (b) those awarded with respect to the activities of the administrator and its counsel to segregate assets and mitigate losses in each of the three estates. The court awarded extraordinary attorney's fees in connection with the surcharge proceedings of $25,000 in the Gerber estate, $10,000 in the Green estate, and $5,000 in the Fishman estate. In addition it surcharged Mr. Kagan and his surety for the expert witness fees of Mr. McCarroll $2,500 in the Gerber estate, $700 in the Green estate, and $300 in the Fishman estate.

There is no authority for recovery of those fees for legal services attributable to litigation relating to the surcharge of the former executor and his surety. "[I]t is statutory law that, 'Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to costs and disbursements, as hereinafter provided.' (Code Civ. Proc., § 1021.) Too, it is the general rule of prevailing decisional law that attorney's fees are not recoverable as costs except where expressly allowed by statute or agreed to by express contract. (*Pacific Gas & Elec. Co.* v. *Nakano,* 12 Cal.2d 711, 715 [87 P.2d 700, 121 A.L.R. 417].) The above rule has been held applicable to probate proceedings. (*Estate of Bevelle,* 81 Cal.App.2d 720, 722 [185 P.2d 90].) . . . In the instant case counsel concerned was representing all of the objectors; as in *Estate of Marré,* 18 Cal.2d 191, 192 [144 P.2d 591], '[E]ach party must pay [her] own attorney's fees since [she] has benefited no one but [herself] in prosecuting [the] action. . . .' " (*Estate of Harvey, supra,* 224 Cal.App.2d 555, 561-562.) Accordingly, the attorney's fees for the surcharge hearing and the disputed expense of employing the expert witness, Mr. McCarroll, to testify on behalf of the estates, are expenses attributable to litigation and are not proper items of surchargeable damages.

The cases relied upon by the Bank are inapposite since they involve situations in which attorney's fees were awarded to the plaintiff not with

respect to the principal action against the defendant, but in regard to an action against a third party necessitated by defendant's tort.

 "[I]n the absence of some special agreement, statutory provision, or exceptional circumstances, attorney's fees are to be paid by the party employing the attorney. (Code Civ. Proc., § 1021; *Reid* v. *Valley Restaurants, Inc.,* 48 Cal.2d 606, 610 [5] [311 P.2d 473]; [citations].) [¶] . . . A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred. [Citations.]" (*Prentice* v. *North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 620 [30 Cal.Rptr. 821, 381 P.2d 645]; see also *Roberts* v. *Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104 [128 Cal.Rptr. 901].) The facts of the present case do not bring it within this exception, nor does it appear that the logic of this exception to the general rule of nonliability would support its extension to the case of the liability of a surety in probate proceedings of this kind. There was no showing that the refusal of the surety to respond in damages without litigation necessitated the present action. This action was essential to determine the extent of its liability and the measure of damages even though Mr. Kagan's negligence as executor was not in issue.

 The elements of surcharge representing extraordinary attorney's fees and executor's commissions *not* directly related to the litigation constitute administration expenses which are ordinarily awarded upon a showing that the charges are reasonable and that the services were necessarily incurred in administration. (Prob. Code, §§ 901, 902.) There is no impediment in the present case to a surcharge of these amounts against Mr. Kagan and his surety since these items represent extraordinary services performed by the administrator and its counsel in the segregation of commingled estate assets, the reconstruction of estate inventories from documents and other evidence, and various legal and mechanical problems of processing the estates which were the direct consequence of Mr. Kagan's negligence. The services thus performed tended to mitigate damages and loss to the various estates. The Bank claimed total extraordinary attorney's fees and executor's commissions for these services as follows: $13,500 in the Gerber estate, $9,250 in the Green estate, and $4,500 in the Fishman estate. Although there appears to be no conflict in the evidence with respect to the amounts claimed, it is incumbent upon the trial court on remand to make an express finding

that these amounts were reasonable and necessary extraordinary expenses in order to support the surcharge against Mr. Kagan and his surety.

## DISPOSITION

The orders and judgments are affirmed with respect to the liability of Mr. Kagan and his surety for damages due to losses suffered by the estates or beneficiaries. The cases are remanded with instructions to the trial court to make and prepare findings with respect to the specific items of damages and amounts to be credited to appellants in each of the estates, and to recompute damages in accord with the principles set forth in this opinion. Costs on appeal shall be borne by each party to the appeal.

Wood, P. J., and Lillie, J., concurred.